MCDONALD, J.:
**124 Hank Eric Hawes appeals his murder conviction, arguing the circuit court erred in (1) admitting unnecessary and prejudicial photographic evidence, (2) allowing the State to recall Hawes to ask a single question intended to elicit testimony that would permit the State to call impeachment witnesses, (3) admitting testimony regarding a prior argument between Hawes and Jennifer Wilson (Victim), and (4) refusing to disqualify the Fifth Circuit Solicitor's Office from prosecuting the case. We affirm.
Facts and Procedural History
Hawes and Victim met online in February 2011 and began dating shortly thereafter, though neither behaved as though the relationship was exclusive. In June 2011, Hawes moved from Simpsonville to Columbia to be closer to Victim, who was a professor at the University of South Carolina (USC).
On August 27, 2011, Victim texted Hawes and offered to bring him breakfast on her way to yoga. Following her yoga class, Victim invited Hawes to her home for lunch. Hawes accepted and the two spent the afternoon together. Around 5:30 p.m., they departed for their respective evening plans.
Hawes went to dinner with a friend at Cantina 76 on Devine Street. He believed Victim planned to attend a coworker's birthday party and then join him around 8:00 p.m. Over the course of the evening, however, Victim's itinerary kept "getting later and later." Hawes left Cantina 76 at approximately 10:30 p.m.
Meanwhile, Victim and a former boyfriend (Friend) attended a surprise birthday party at Cowboy Steakhouse on Main Street. Shortly after 10:00 p.m., Victim and Friend traveled from the restaurant to another friend's house where the birthday celebration continued. They stopped at Friend's house around 12:30 a.m.; Victim then attended a party at a fellow USC professor's house, where she stayed until approximately 1:30 a.m.
**125 Hawes last texted and called Victim shortly after 2:00 a.m. on the morning of August 28, and then drove to her duplex. According to Hawes, he told Victim he wanted to end their relationship and an argument ensued. Ultimately, Hawes stabbed Victim twelve times,[1] unclothed her, washed her body, and *517 placed her on a couch in the living room area.[2] Hawes then cut his own wrists and collected his blood in a cooler bag.
Victim's next-door neighbor at the duplex, Kelly Smith, was awakened at 2:29 a.m. by sounds of "screaming and physical violence" and called 911. Two officers from the City of Columbia Police Department (CPD) arrived at the duplex at 2:47 a.m., but did not enter because they did not observe any lights, sounds of distress, or signs of a struggle.
Over the next few hours, Hawes remained in Victim's home and placed several calls to two former girlfriends (Female 1 and Female 2, respectively). He also searched the internet for "criminal attorney[s] in Columbia, South Carolina." At 5:22 a.m., Hawes sent Female 1 an email with the subject line "Last Will," in which he purported to leave her all of his assets. Around 9:00 a.m., Hawes called a local attorney and authorized him to report Victim's death. Thereafter, Hawes called Female 2 and confided he might be charged with murder and needed $25,000 for legal representation. He also claimed he had attempted suicide. Female 2 told Hawes she did not have $25,000 and encouraged him to seek medical attention. EMS subsequently transported Hawes to Baptist Hospital.
CPD responded to Victim's home at approximately 11:30 a.m., where officers found her body on the living room couch.[3] Although they found blood at the rear entry to the duplex and in the kitchen, there was very little blood on Victim or the **126 comforter covering her. Later that day, CPD officers arrested Hawes at Baptist Hospital and charged him with murder. On October 5, 2011, the Richland County Grand Jury indicted Hawes for murder.
On December 12, 2012, Hawes moved to disqualify the Fifth Circuit Solicitor's Office from prosecuting the case because an assistant solicitor and her husband were fact witnesses. Following a hearing, the circuit court denied the motion.
The case went to trial on October 6, 2014. The circuit court denied Hawes's motions for directed verdict and instructed the jury on the elements of murder, voluntary manslaughter, and self-defense. On October 16, 2014, after two days of deliberation, the jury returned a verdict finding Hawes guilty of murder. The circuit court sentenced Hawes to life in prison.
Standard of Review
"In criminal cases, the appellate court sits to review errors of law only." State v. Wilson , 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001). This court is "bound by the trial court's factual findings unless they are clearly erroneous." Id. at 6, 545 S.E.2d at 829. As to evidentiary issues, "we are limited to determining whether the trial judge abused his discretion." Id. "An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." State v. Black , 400 S.C. 10, 16, 732 S.E.2d 880, 884 (2012) (quoting State v. Jennings , 394 S.C. 473, 477-78, 716 S.E.2d 91, 93 (2011) ). "To warrant reversal, an error must result in prejudice to the appealing party." Id. at 16-17, 732 S.E.2d at 884.
Law and Analysis
I. Photographs
Hawes argues the circuit court erred in allowing the State to use "unnecessary and prejudicial photographic evidence" during closing argument to arouse the passions and prejudices of the jury. He asserts the crime scene photographs of Victim's unclothed body were unfairly prejudicial because the State juxtaposed them with an irrelevant smiling photograph of the Victim. Hawes contends the erroneous admission of State's Exhibits 46 (right neck and breast **127 wounds ), 202 (close-up of neck wound ), and 322 (birthday party photograph) suggested an improper, *518 emotional basis for the jury to consider, resulting in his conviction.
Hawes objected under Rule 401, SCRE, to the introduction of two photographs of Victim and other guests at the birthday party Victim attended on the night she was murdered. The circuit court overruled the objection and admitted the photographs as State's Exhibits 322 and 325. Hawes later lodged a Rule 403, SCRE, objection to all of the crime scene photographs. The circuit court excluded several of the photographs and marked them as "Court's Exhibit 3" to ensure they would not be submitted to the jury in error. Thereafter, Hawes again objected to the introduction of the following photographs from the crime scene: State's Exhibits 31 (the body on the couch), 33 (the body on the couch and cooler on the floor), 38 (a bite mark), 41 (neck and breast wounds ), 42 (breast wound ), 45 (left neck wound ), 46 (right neck wound ), 54 (left leg bruise), 60 (close-up of a back wound ), and 62 (three back wounds ). Hawes argued the crime scene photographs were "gruesome" and would serve only to "elicit an emotional response from the jury" because he did not contest how the body was found.
Citing State v. Collins , 409 S.C. 524, 763 S.E.2d 22 (2014), and State v. Gray , 408 S.C. 601, 759 S.E.2d 160 (Ct. App. 2014), the State argued the crime scene photographs were "necessary to substantiate material facts" regarding the "nature of the crime" and to show evidence of malice. Hawes responded that Collins and Gray were distinguishable because those cases addressed only autopsy-related photographs, which were necessary to corroborate testimony and rebut opposing testimony, whereas here, the crime scene photographs were unnecessary for corroboration. The circuit court ruled the probative value of the crime scene photographs outweighed their prejudicial effect because they depicted the scene and location of the body. Further, the wound photographs were relevant to the issue of malice.
Hawes subsequently objected to the introduction of State's Exhibit 398 (the crime scene video), which was filmed by CPD crime scene investigator (CSI) George Wise. Specifically, Hawes objected to the portion of the video showing Victim's body, just as he had previously objected to the admission of **128 similar photographs. Lastly, Hawes objected to the introduction of the autopsy photographs. The circuit court overruled these objections and allowed the introduction of the crime scene video and eighteen photographs from Victim's autopsy.
Initially, we find Hawes's abandoned his argument regarding State's Exhibit 398 (the crime scene video) and the autopsy photographs. Hawes briefly argued in his opening appellate brief that all of the crime scene photographs, the crime scene video, and the autopsy photographs should have been excluded because they were unfairly prejudicial. In his reply brief, Hawes argues his appellate brief clearly indicates his appeal includes "all the still photographs from the scene admitted over trial counsel's objection" and "the still photographs from the autopsy." He contends the "outline headings" and "argument text" in his opening brief establish that his appeal includes State's Exhibit 398. However, the "outline heading" simply states, "[t]he [circuit] [c]ourt wrongly allowed the introduction of unnecessary, gruesome photographs and video." And the argument text mentions only that the circuit court admitted the crime scene video over Hawes's objection. See Englert, Inc. v. Netherlands Ins. Co. , 315 S.C. 300, 304 n.2, 433 S.E.2d 871, 873 n.2 (Ct. App. 1993) (noting a one sentence argument is too conclusory to present any issue on appeal). Hawes failed to include the challenged exhibits in his designation of matter to be included in the record on appeal, and neither the crime scene video nor the autopsy photographs appear in the record. See Rule 209 (b), SCACR ("The Designation must clearly identify what the party desires to have included in the Record on Appeal...."); Rule 210(h), SCACR ("[T]he appellate court will not consider any fact that does not appear in the Record on Appeal."); Helms Realty, Inc. v. Gibson-Wall Co. , 363 S.C. 334, 339, 611 S.E.2d 485, 488 (2005) (explaining the appellant has the burden of providing a sufficient record).
After careful review, we find Hawes abandoned some-but certainly not all-of his arguments regarding the photographic evidence introduced at trial. Although his arguments *519 focus on State's Exhibits 46 (right neck wound ), 202 (close-up of neck wound ), and 322 (birthday party photograph), we find Hawes also preserved his arguments addressing State's Exhibits 31 (the body on the couch), 33 (the body on the couch and cooler **129 on the floor), 38 (a bite mark), 41 (neck and breast wounds ), 42 (breast wound ), 45 (neck wound ), 54 (left leg bruise), 60 (close-up of a back wound ), and 62 (three back wounds ).
Generally, "[a]ll relevant evidence is admissible." Rule 402, SCRE. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." Rule 403, SCRE. "Unfair prejudice means an undue tendency to suggest a decision on an improper basis." State v. Lyles , 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct. App. 2008) (quoting State v. Gilchrist , 329 S.C. 621, 627, 496 S.E.2d 424, 427 (Ct. App. 1998) ).
"The relevancy, materiality, and admissibility of photographs as evidence are matters left to the sound discretion of the trial court." State v. Johnson , 338 S.C. 114, 122, 525 S.E.2d 519, 523 (2000). "However, photographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or unnecessary to the issues at trial." Id. "To be classified as unfairly prejudicial, photographs must have a 'tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.' " State v. Torres , 390 S.C. 618, 623, 703 S.E.2d 226, 228-29 (2010) (quoting State v. Franklin , 318 S.C. 47, 55, 456 S.E.2d 357, 361 (1995) ). "We review a trial court's decision regarding Rule 403 pursuant to the abuse of discretion standard and are obligated to give great deference to the trial court's judgment." Collins , 409 S.C. at 534, 763 S.E.2d at 28 (quoting State v. Adams , 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003) ).
In Collins , the circuit court admitted into evidence seven pre-autopsy photographs of a child who died of "extensive traumatic injury" after being severely mauled by dogs. Id. at 528-33, 763 S.E.2d at 25-27. This court reversed, finding the circuit court erroneously admitted the photographs, and the error was not harmless. Id. at 533, 763 S.E.2d at 27. However, our supreme court reversed, finding the photographs were "highly probative, corroborative, and material in establishing **130 the elements of the offenses charged; [their] probative value outweighed [their] potential prejudice; and the appellate court should not have invaded the trial court's discretion in admitting this crucial evidence based on its emotional reaction to the subject matter presented." Id. at 534-35, 763 S.E.2d at 28.
In Gray , the circuit court admitted into evidence eleven photographs of a victim-taken before and during autopsy-who died after being severely beaten during two separate fights on the same day. 408 S.C. at 604-07, 609, 759 S.E.2d at 162, 163-65. This court determined it was within the circuit court's discretion to admit eight of the photographs of high probative value presenting minimal danger of unfair prejudice, noting the photographs "contain no blood or gory anatomical details, and thus pose little, if any, danger of unfair prejudice." Id. at 609, 759 S.E.2d at 164. As for the remaining three photographs, which were taken during autopsy and showed the victim's exposed skull and brain, we concluded they too had probative value; they corroborated the pathologist's findings concerning the extent and location of the victim's head injuries and cause of death and were important to the State's ability to prove malice. Id. at 612-16, 759 S.E.2d at 166-68.
Here, the crime scene photographs established the circumstances of the crime scene and corroborated the testimony of Smith and CSI Wise. See e.g. , State v. Kelley , 319 S.C. 173, 178, 460 S.E.2d 368, 370 (1995) (finding photographs of the murder victim's nude body lying on the floor, with her face and body visibly swollen from being beaten, and of the blood-smeared walls and floor were relevant to establish the crime scene). Smith, who lived next door to Victim, woke to sounds of "screaming and physical violence" and called 911. He heard the first wave of *520 violence in Victim's bedroom; it then progressed toward the kitchen area where "there was a second wave of more aggressive, just brutal, carnal[,] instant violence." Smith described "physically feel[ing] the vibration in [his] bedroom from what was coming from [Victim's side of the duplex].... [and he] could hear what sounded like a table slamming against the wall, like her body being thrown against the wall." The last thing Smith heard was Victim yelling "no, no, no" and "pleading for her life." The next morning, CSI Wise photographed and recorded the crime scene. He testified **131 in detail regarding the state of Victim's home as well as the items collected as evidence.
We find the circuit court did not abuse its discretion in admitting the crime scene photographs. See e.g. , Torres , 390 S.C. at 623, 703 S.E.2d at 229 (explaining it is not an abuse of discretion for a trial court to admit photographic evidence if it is offered to corroborate testimony). Specifically, we find the circuit court correctly applied Rule 403's balancing analysis in ruling the probative value of the crime scene photographs outweighed their prejudicial effect because these photos showed "the scene as it occurred" and "where the body was found in the house."
Further, the circuit court properly evaluated the probative value of the crime scene photographs with respect to the question of malice, explaining that they established "the wounds that were inflicted on the victim, which would go to the issue of malice." As in Gray , the crime scene photographs were relevant to the issue of malice because they showed how, where, and how many times Victim was attacked. See S.C. Code Ann. § 16-3-10 (2015) (defining "murder" as "the killing of any person with malice aforethought, either express or implied"); State v. Kinard , 373 S.C. 500, 503-04, 646 S.E.2d 168, 169 (Ct. App. 2007) (" 'Malice aforethought' is defined as as 'the requisite mental state for common-law murder' and it utilizes four possible mental states to encompass both specific and general intent to commit the crime." (quoting Malice Aforethought , Black's Law Dictionary (7th ed. 1999) ) ). The crime scene photographs illustrated the extreme nature of this killing as they show multiple wounds and abrasions on Victim's extremities, contusions all over her body, and a bite mark. See Kelley , 319 S.C. at 178, 460 S.E.2d at 371 (finding charts, photographs, and a video depicting the excess nature of the killing were both relevant and probative to the issue of malice).
In contrast to the crime scene photographs of Victim's neck wounds (State's Exhibits 46 and 202), the State presented two other photographs from the birthday party Victim attended during the evening before her murder.[4] State's Exhibit **132 322 shows Victim in sleeveless attire, arguably to demonstrate her arms and shoulders were devoid of wounds hours before her body was discovered. While the State argues this photograph was relevant to the issue of malice, Hawes cites State v.Langley , 334 S.C. 643, 515 S.E.2d 98 (1999), State v. Livingston , 327 S.C. 17, 488 S.E.2d 313 (1997), and State v. Johnson , 293 S.C. 321, 360 S.E.2d 317 (1987), for the proposition that "such photographs are irrelevant, inflammatory, and prejudicial."
In Langley , our supreme court found the circuit court erroneously admitted a photograph of the murder victim in his high school graduation regalia because the photograph was not relevant to proving defendant's guilt. 334 S.C. at 648, 515 S.E.2d at 100. The victim's identity was not at issue, and the court concluded that the only possible purpose of the photograph was to distance the victim from the drug dealing involved in the case. Id. at 648 n.3, 515 S.E.2d at 100 n.3. Similarly, in Livingston , the supreme court held a photograph of the victim and her husband taken shortly before she was involved in a fatal automobile accident was of no consequence to the determination of guilt at the defendant's felony DUI trial. 327 S.C. at 20, 488 S.E.2d at 314. In Johnson , the State sought to introduce photographs of another murder victim as evidence of other crimes to establish the defendant's motive *521 and intent to kill. 293 S.C. at 325, 360 S.E.2d at 320. However, the court explained that the first victim "died from a gunshot wound to the head and that the body was concealed in the camper" whereas the defendant shot the second victim, a State Trooper, after he initiated a traffic stop and began questioning the defendant. Id. at 325, 360 S.E.2d at 320. Thus, the photographs of the first victim's body were irrelevant and erroneously introduced. Id.
Here, State's Exhibit 322 was admitted neither to establish Victim's identity nor to demonstrate motive. Instead, the State argues, the photograph was admitted as evidence of malice. We reject this argument and find the admission of the birthday party photographs constituted error. See e.g. , Langley , 334 S.C. at 648, 515 S.E.2d at 100 (finding the victim's **133 photograph was irrelevant to proving the guilt of the defendant). However, we find the error harmless as it could not reasonably have affected the outcome of Hawes's trial. See e.g. , State v. Mitchell , 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) ("Error is harmless when it 'could not reasonably have affected the result of the trial.' " (quoting State v. Key, 256 S.C. 90, 180 S.E.2d 888 (1971) ) ); Langley , 334 S.C. at 647-48, 515 S.E.2d at 100 ("Even if the evidence was not relevant and thus wrongly admitted by the trial judge, its admission may constitute harmless error if the irrelevant evidence did not affect the outcome of the trial.").
II. Reply Testimony
Hawes argues the circuit court erred in allowing the State to recall him the day after it had already concluded his cross-examination. The State sought to ask a single question intended to elicit testimony that would permit the State to call impeachment witnesses.
Hawes testified that he killed Victim in self-defense. At the conclusion of the State's cross-examination-during which Hawes claimed Victim was the aggressor-the State argued Hawes "opened the door" to his prior acts of domestic violence and sought to proffer testimony from four of his previous girlfriends regarding physical abuse, threats, and a previous conviction. The State then proposed a condensed proffer of the two most recent and similar events involving Female 1 and another former girlfriend (Female 3). The circuit court declined to hear the proffer at that time, stating it did not believe Hawes had opened the door, and such testimony would not be admissible under State v. Lyle .[5] The circuit court clarified, "Now I'm not saying that some other witnesses may not open the door." The circuit court later determined it would allow the State to proffer the testimony the next day, and then revisit its ruling as to the admissibility Hawes's prior acts.
The following morning, the State proffered the testimony of Female 1 and Female 3 regarding prior incidents of domestic violence by Hawes. Relying on State v. Michau , 355 S.C. 73, 583 S.E.2d 756 (2003) and **134 State v. Beck , 342 S.C. 129, 536 S.E.2d 679 (2000), the State argued some of the proffered testimony should be admitted to rebut Hawes's self-defense claim. Specifically, the State sought to introduce evidence of a conversation in which Hawes told Female 1 that if she ever called law enforcement, he would make it look like their altercation was her fault. The State also sought to introduce evidence of an incident during which Hawes pulled a knife on Female 3. Hawes objected, arguing Rule 404(b), SCRE,[6] barred such testimony. The circuit court declined to allow the introduction of the proffered testimony because it was "too remote in time."
Thereafter, the State argued Hawes was still on the witness stand and it wished to ask *522 him one question for impeachment purposes: Did Hawes tell Female 1 that if she ever called law enforcement, he would make it look like it was her fault? Despite Hawes's arguments and strenuous objection, the circuit court determined Hawes was still "technically on cross-examination." The court ruled, "I reopened it for the State and I said I [would] listen to the testimony this morning in camera and make a decision. So I revisited that issue at the hearing.... from that standpoint[,] the procedure was not concluded.... regardless of what's on the record."[7] The circuit court explained, "I'm not letting [the proffered testimony] come in [during the State's] case in chief. [The State] wants to ask [Hawes one] question, lay down the foundation for impeachment is the way I understand it.... [the State's] cross is not over." Hawes argued, "There is no way for them to put [Female 1] on the witness stand and her to offer testimony that doesn't go into the prior bad acts violence that she alleges took place between her and Mr. Hawes. That is absolutely **135 [Rule] 404." The circuit court responded that Hawes could make his objection if and when the State recalled Female 1.
The State then recalled Hawes to the witness stand and asked, "In the fall of 2010, specifically in October, November, that area, do you remember making a statement to [Female 1] at her home ... that if she ever called law enforcement, you would make it look like it was her fault?" Hawes answered, "No, I do not."
The State then proposed to recall Female 1 to testify. Hawes again objected under Rule 404. The circuit court explained "the only thing I'm going to allow her to testify to is the statement itself, not what led up to the statement.... Not going into threats or any violence or anything else. No pushing or shoving or anything." On direct examination, Female 1 testified, "He told me that if I were to call law enforcement ... that I would be the one to go to jail."
Appellate courts "will not disturb a trial court's ruling concerning the scope of cross-examination of a witness to test his or her credibility, or to show possible bias or self-interest in testifying, absent a manifest abuse of discretion." State v. Gracely , 399 S.C. 363, 371, 731 S.E.2d 880, 884 (2012). "Every witness under cross-examination may be asked whether he has made any former statement relative to the subject matter of the action and inconsistent with his present testimony." Aakjer v. Spagnoli , 291 S.C. 165, 170, 352 S.E.2d 503, 507 (Ct. App. 1987).
"When an accused takes the stand, he becomes subject to impeachment, like any other witness. Regardless of whether the accused offers evidence of his good character, an accused who takes the stand may be cross-examined about 'past transactions tending to affect his credibility.' " State v. Major , 301 S.C. 181, 183, 391 S.E.2d 235, 237 (1990) (quoting State v. Allen, 266 S.C. 468, 482, 224 S.E.2d 881, 886 (1976) ). "First, the accused may be asked about prior bad acts, not the subject of a conviction, which go to his credibility." Id. at 184, 391 S.E.2d at 237. However, the cross-examiner must take the accused's answer and may not contradict the accused if he denies them. Id. "Second, the accused may be impeached by the introduction into evidence of convictions for crimes of **136 moral turpitude, since they too are past transactions tending to affect credibility." Id.
In Michau , the appellant requested that the circuit court redact nine sentences from his written statement to the police because those portions of the statement constituted inadmissible propensity evidence under Rule 404(b), SCRE. 355 S.C. at 78, 583 S.E.2d at 759. The circuit court agreed to redact the last six sentences from the statement, but declined to redact three others. Id. Our supreme court held the circuit court properly overruled the appellant's Rule 404(b) objection to the three sentences. Id. at 79, 583 S.E.2d at 759. The court explained the three sentences did not constitute propensity evidence because they did not refer to any "crimes, wrongs, or acts" generally inadmissible under Rule 404(b). Id.
Similarly in Beck , our supreme court explained, "Testimony that [the a]ppellant had *523 made a statement of his intent to perpetrate such crimes-albeit four months prior to this event-was highly probative as to a manifestation of that intent through the fatal attack upon [the v]ictim." 342 S.C. at 135, 536 S.E.2d at 682. In particular, the court found that a witness's statement that the appellant had asked him on a specific date "to participate in a plan to call escort services for dates and then rob and have sex with the employees" did not invoke Lyle , which concerns prior bad acts. Id. at 134-35, 536 S.E.2d at 682. The court held that as a general rule, statements made by the accused are admissible against him. Id.
Hawes argues the circuit court erred in admitting Female 1's testimony, as such "bad acts" evidence is barred under Rule 404(b), SCRE. Arguably, the circuit court could have admitted the statement at issue under Rule 404(b) to prove Hawes was not acting in self-defense. See id. (stating such evidence "may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent"). But a prior statement of bad intent is not a prior bad act. See Anderson v. State , 354 S.C. 431, 435, 581 S.E.2d 834, 836 (2003) (determining a threatening statement was not a bad act); Beck 342 S.C. at 134, 536 S.E.2d at 682 (explaining Lyle concerns bad acts and other crimes of a defendant, not statements of intent to commit crimes). Thus, we find the circuit court did not abuse its **137 discretion in finding the State's final cross-examination inquiry concerned an impeachment issue, not a Rule 404(b) issue. Whether the State could then recall Female 1 to ask her about Hawes's statement depended on whether Hawes admitted telling her that if she ever called law enforcement, she would be the one to go to jail. In fact, the State agreed that if Hawes admitted to the statement, it would not be able to offer extrinsic testimony.[8]
Female 1's testimony was relevant to Hawes's credibility regarding his claim that Victim was the aggressor, and thus, was significant evidence for the jury's consideration. Contrary to Hawes's testimony that he killed Victim in self-defense, Female 1's statement established that, in the past, Hawes had planned to make a girlfriend appear at fault in the event of a police investigation. Therefore, the testimony was properly admitted. See State v. Alford , 264 S.C. 26, 32, 212 S.E.2d 252, 254 (1975), overruled on other grounds by State v. Belcher , 385 S.C. 597, 685 S.E.2d 802 (2009) (where "connection with the offense sufficiently appears, evidence of prior difficulties between [the] accused and a third person is admissible to show malice, premeditation, or general state of mind...." (quoting 40 C.J.S. Homicide § 209 ) ) ); United States v. Queen , 132 F.3d 991, 996 (4th Cir. 1997) ("The more similar the extrinsic act or state of mind is to the act involved in committing the charged offense, the more relevance it acquires toward proving the element of intent.").
Our review of the record reveals the vast majority of the evidence undermines Hawes's testimony that he acted in self-defense, including, but not limited to: Smith's testimony regarding the attack; the blood evidence found in Victim's home; Victim's badly beaten, bruised, and stabbed body; the bite mark on Victim; Hawes's unresponsiveness to law enforcement's initial inquiry at Victim's home; Hawes's lack of non-self-inflicted injuries; his treatment of Victim's body following **138 the attack; and the various contacts he made in the early morning hours following the attack. Simply put, other than his own self-serving testimony, Hawes failed to present any evidence that he acted in self-defense. Thus, even if the circuit court erred in admitting the final cross-examination inquiry and Female 1's testimony, such error would have been harmless due to the overwhelming evidence of Hawes's guilt. See State v. Chavis , 412 S.C. 101, 110 n.7, 771 S.E.2d 336, 340 n.7 (2015) (stating an error in admitting certain testimony could be deemed harmless because of the existence of overwhelming *524 evidence of guilt); State v. Fossick , 333 S.C. 66, 70, 508 S.E.2d 32, 34 (1998) ("In determining harmless error regarding any issue of witness credibility, [appellate courts] consider the importance of the witness's testimony to the prosecution's case, whether the witness's testimony was cumulative, whether other evidence corroborates or contradicts the witness's testimony, the extent of cross-examination otherwise permitted, and the overall strength of the State's case.").
III. Smith's Prior Argument Testimony and Statement to Law Enforcement
Hawes argues the circuit court erred in allowing Smith to testify regarding a prior argument between Hawes and Victim. Hawes further contends the circuit court's erroneous ruling was based on its belief that Hawes opened the door to this otherwise inadmissible evidence of an alleged prior bad act. According to Hawes, the circuit court's admission of this unduly prejudicial evidence inflamed the passions and prejudices of the jury against him. We disagree.
Prior to Smith's testimony, the State advised the circuit court it wanted to elicit testimony that Smith heard Victim and Hawes fighting a few months before Victim was killed. Specifically, Smith planned to testify he heard Victim "yell out 'no' " in fear. Although the circuit court allowed the State to question Smith regarding what he actually heard, it granted Hawes's motion to exclude Smith's characterization that Victim cried out 'like he was hurting her.' "
On direct examination, Smith testified their duplex residences were "mirrored" and he could "hear everything [Victim and Hawes] said in the living room" so long as it was "above **139 speaking volume." He recalled hearing a prior argument between Victim and Hawes through the common wall of the duplex around the "end of May, beginning of June." In particular, he heard "mumbling and then it led to her saying 'no' very loudly. Like, 'No, No.' " When Victim later approached him in their shared backyard, Smith told her "sometimes relationships get heated" and advised Victim she could call on him "if she needed anything." Smith was alarmed to see Hawes at Victim's home in August 2011 because he believed they were "on the outs" at that point in time.
Thereafter, Smith testified he woke up on August 28, 2011, at approximately 2:29 a.m., to the sounds of "screaming and physical violence" and called 911. He explained the first wave of violence began in Victim's bedroom and progressed towards the kitchen area where "there was a second wave of more aggressive, just brutal, carnal[,] instant violence." Smith described "physically feel[ing] the vibration in my bedroom from what was coming from [Victim's side of the duplex].... I could hear what sounded like a table slamming against the wall, like her body [was] being thrown against the wall." The last thing Smith heard was Victim yelling "no, no, no" and pleading for her life.
On cross-examination, Smith admitted that his original statement to police did not mention any specific rooms where he believed the attack took place. Hawes inquired, "So when you describe prior difficulties between [Victim and Hawes] in that summer and you're asked whether you ever remember it, you mentioned yes, one time before." Smith confirmed and added, "[o]ne time that stood out."
On redirect, the State noted Smith's statement to law enforcement reflected that the last struggle occurred at the back door. The State asked Smith to continue his answer from cross-examination and explain what was in his statement about the prior altercation. Smith then testified he "heard [Victim] screaming like [Hawes] was hurting her and [Victim] saying 'no.' " Hawes objected and Smith confirmed the description of the prior difficulty was in his written statement.
Outside the presence of the jury, Hawes asserted his line of questioning did not open the door for the State to elaborate on inadmissible evidence and moved for a mistrial. Citing **140 Rule 106, SCRE,[9] the State argued Hawes's questioning inferred Smith *525 had given incomplete information in his statement and its admission of the remainder of the statement corrected this impression by providing the more complete and detailed account. The circuit court denied Hawes's motion for a mistrial and overruled his objection, finding he opened the door on cross-examination. The court stated, "It was insinuated directly towards [Smith that he] did not hear properly through the walls [but] he heard properly enough to realize, or at least, [think] that she was in danger of being hurt."
This court addressed a similar issue in State v. Patterson , 367 S.C. 219, 625 S.E.2d 239 (Ct. App. 2006). There, the circuit court admitted an entire police statement on redirect. Id. at 225, 625 S.E.2d at 242. After eliciting testimony from the victim's friend "regarding how careful she was in giving police a correct depiction of the events that led to [the victim]'s murder," the defendant insinuated that the victim's friend's statement was incomplete. Id. at 227, 625 S.E.2d at 243. This court found the defendant put the victim's friend's "statement to police at issue, and fundamental fairness required that the entire statement be admitted into evidence." Id. at 227-28, 625 S.E.2d at 243. This court continued:
Patterson would have us construe Rule 106 in such a way that inquiries that probed at alleged omissions from a statement would not open the door to the admission of the statement. The purpose behind Rule 106 would be frustrated if the rule's application in a given case depended upon whether an alleged oral assertion was or was not in a written statement. We find the rule of completeness applies to insinuations, innuendos, and omissions. Thus, the trial judge properly admitted [the victim's friend]'s statement.
Id. at 228, 625 S.E.2d at 243.
Once Hawes posed questions challenging the sufficiency and accuracy of Smith's police statement, the State was free to question him regarding the previously excluded details in the written statement that supported Smith's testimony. See **141 State v. Cabrera-Pena , 361 S.C. 372, 379, 605 S.E.2d 522, 525 (2004) (explaining Rule 106 is based on the rule of completeness and attempts to avoid the unfairness inherent in the misleading impression created by taking matters out of context); State v. Stroman , 281 S.C. 508, 513, 316 S.E.2d 395, 399 (1984) ("The scope of redirect rests in the discretion of the trial court."). Therefore, we find the circuit court correctly determined Hawes "opened the door" based on his "insinuations, innuendos, and omissions" during his examination of Smith regarding Smith's statement to law enforcement. See State v. Page , 378 S.C. 476, 482, 663 S.E.2d 357, 360 (Ct. App. 2008) ("It is firmly established that otherwise inadmissible evidence may be properly admitted when opposing counsel opens the door to that evidence.").
IV. Disqualification
Hawes argues the circuit court erred in refusing to disqualify the Fifth Circuit Solicitor's Office from prosecuting his case because an assistant solicitor and her husband were two of the fact witnesses. We disagree.
On December 12, 2012, Hawes moved to disqualify the Solicitor's Office, arguing disqualification was necessary to avoid the appearance of impropriety and to allow for a fair trial. At the December 19, 2012 hearing, Hawes argued assistant solicitor Kathryn Ashton was "a material witness" because she was Victim's neighbor. Hawes also asserted Ashton and her husband were material witnesses because they claimed to see Hawes leaving the crime scene in a car they recognized. Hawes did not claim any bias or unfair treatment, but asserted "for appellate things down the road, it is really the appearance of impropriety."
The record establishes that Ms. Ashton immediately informed the Solicitor's Office when CPD identified her as a witness. From that moment on, there was no contact with Ms. Ashton within the Solicitor's Office regarding Hawes's prosecution; the Solicitor's Office built an ethical wall around her. The State explained her only participation in the case was providing law enforcement a statement of what she observed. The State indicated it might not even call Ms. Ashton as a **142 witness at trial and offered for her testimony *526 to be restricted or heard in limine to avoid any hint of impropriety.
By order dated February 1, 2013, the circuit court denied Hawes's motion, determining there was no right to disqualification and Hawes failed to show how Ms. Ashton's position prejudiced him or his right to a fair trial.
Ms. Ashton did not testify at trial. Her husband briefly testified that he saw Hawes leave Victim's home on the morning of August 28, 2011. He described the event as "odd" and "unique," and explained that Hawes "looked like he was driving with his forearms."
"[E]ven if a prosecutor is called as a witness by the defense, it is not always necessary for a trial judge to recuse the prosecutor or the prosecuting office in its entirety." State v. Inman , 395 S.C. 539, 558, 720 S.E.2d 31, 41 (2011). "In fact, '[t]here is no inherent right to disqualification when a member of the state attorney's office is called as a witness in a case prosecuted by a state attorney in the same office, unless actual prejudice can be shown.' " Id. (quoting 81 Am. Jur. 2d Witnesses § 229 (2004 & Supp. 2011) ).
South Carolina law "places upon the moving party the burden of showing actual prejudice from the failure to disqualify." State v. Patterson , 324 S.C. 5, 19, 482 S.E.2d 760, 767 (1997). In State v. Smart , our supreme court addressed the standard for disqualification of a solicitor's office when a lawyer in that office was previously employed by the public defender's office during the pendency of charges against the defendant. 278 S.C. 515, 519, 299 S.E.2d 686, 688-89 (1982), overruled on other grounds by State v. Torrence , 305 S.C. 45, 406 S.E.2d 315 (1991). Adopting the requirement that a defendant must show actual prejudice, the court affirmed the denial of Smart's motion for disqualification. Id. at 518-21, 299 S.E.2d at 688-89. Thereafter, the court again articulated an actual prejudice standard in State v. Chisolm , 312 S.C. 235, 238, 439 S.E.2d 850, 852 (1994).
In State v. Bell , a criminal defendant contended the circuit court erred in refusing to disqualify the solicitor's office from prosecuting his case because a current investigator with the solicitor's office had previously interviewed the defendant when the investigator worked for the public defender's office.
**143 374 S.C. 136, 139, 646 S.E.2d 888, 890 (Ct. App. 2007). The defendant argued the investigator's initial involvement with his defense and subsequent involvement in a request for bond reduction and service of subpoenas while employed by the solicitor's office adversely affected his trial and his efforts to plea bargain. Id. at 142, 646 S.E.2d at 891. This court found "[t]here simply is no evidence [the investigator] was involved with any substantive or strategic prosecution work suggestive of betrayal of any secrets or confidences." Id. at 142, 646 S.E.2d at 892. "Contrary to [his] assertion, ... no breach of confidence occurred and there was no actual prejudice to [the defendant]." Id. at 143, 646 S.E.2d at 892.
Hawes relies heavily on People v. Conner , 34 Cal.3d 141, 193 Cal.Rptr. 148, 666 P.2d 5 (1983), arguing "this situation would, at minimum, give rise to an appearance of impropriety or partiality" and "at worst, result in the demonstrable unfairness or prejudice." In Conner , the prosecutor was both "a witness to, and a potential victim of, [the] defendant's alleged criminal conduct" regarding his escape charges. Id. , 193 Cal.Rptr. 148, 666 P.2d at 6-9. Although the trial court denied the defendant's motion for disqualification of the judge and the prosecutor's office with respect to his original criminal charges for burglary and forgery, it granted the defendant's motion to recuse the entire prosecutor's office as to his escape charges. Id. , 193 Cal.Rptr. 148, 666 P.2d at 7. The appellate court upheld the trial court's determination that there was a conflict of interest in the escape case "[b]ecause of the dramatic and gripping nature of the circumstances, the pervasiveness of the communications regarding [the prosecutor]'s relationship to the incident, and the difficulty in gauging their cumulative effect." Id. , 193 Cal.Rptr. 148, 666 P.2d at 9.
Here, the record reflects that Ms. Ashton neither formerly represented Hawes nor witnessed this attack. In her statement to law enforcement, Ms. Ashton merely stated she saw Hawes driving away from Victim's home *527 on the morning of August 28, 2011. Further, she neither testified at Hawes's trial nor participated in any aspect of his prosecution. While Hawes cites cases from other jurisdictions to support his assertion that an ethical wall is ineffective, he cannot meet South Carolina's test for determining disqualification-the demonstration of actual prejudice. See **144 Smart , 278 S.C. at 518-21, 299 S.E.2d at 688-89 (adopting the requirement that a criminal defendant must show actual prejudice from a failure to disqualify). Therefore, we affirm the circuit court's order denying Hawes's motion to disqualify the Fifth Circuit Solicitor's Office.
Conclusion
Hawes's conviction is
AFFIRMED.
GEATHERS and HILL, JJ., concur.

Victim sustained multiple defense wounds, blunt force trauma ("at least[ ] three blows to the head"), abrasions, contusions, eleven incised wounds, and one bite mark.

The cause of death was blood loss due to a stab wound to the right side of Victim's neck. However, six of the twelve stab wounds could have been individually fatal. Even if the neck injury had been Victim's only wound, the pathologist opined she would have died within approximately two minutes.

EMS arrived at 11:51 a.m. and pronounced Victim dead at the scene.

Although Hawes's appellate brief does not specifically list State's Exhibit 325, it does reference "photographs of [Victim] smiling in happier times." State's Exhibits 322 and 325 are included in the record on appeal, and we have considered both for purposes of our analysis.

125 S.C. 406, 416, 118 S.E. 803, 807 (1923) (explaining the permissible uses of evidence of prior bad acts).

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b), SCRE. Such evidence "may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent." Id . "Once bad act evidence is found admissible under Rule 404(b), the trial court must then conduct the prejudice analysis required by Rule 403, SCRE." State v. Wallace , 384 S.C. 428, 435, 683 S.E.2d 275, 278 (2009).

The record reflects that the previous afternoon, when the circuit court asked if the State had "any further cross," the State responded, "No, sir."

"Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is advised of the substance of the statement, the time and place it was allegedly made, and the person to whom it was made, and is given the opportunity to explain or deny the statement. If a witness does not admit that he has made the prior inconsistent statement, extrinsic evidence of such statement is admissible." Rule 613(b), SCRE.

"When a ... recorded statement, or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other ... recorded statement which ought in fairness to be considered contemporaneously with it." Rule 106, SCRE.