# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Benjamin Jerome Blake, Appellant.

Appellate Case No. 2018-001943

---

Appeal From Hampton County
Kristi F. Curtis, Circuit Court Judge

---

Opinion No. 6045
Heard December 7, 2021 – Filed January 17, 2024

---

**AFFIRMED**

---

Appellate Defender Kathrine Haggard Hudgins, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Ambree Michele Muller, both of
Columbia; and Isaac McDuffie Stone, III, of Bluffton, for
Respondent.

---

**MCDONALD, J.:** Benjamin Jerome Blake appeals his convictions for attempted
murder, assault and battery of a high and aggravated nature (ABHAN), and
possession of a weapon during the commission of a violent crime, arguing the

circuit court erred in allowing the State to question him about an unrelated prior bad act and in failing to conduct a proper *Batson*[1] analysis. We affirm.

**Facts and Procedural History**

On November 7, 2015, Blake shot at Jeantaviene "Chabby" Dobson but missed. The errant shot struck Dobson's pregnant sister, Tiffany Lakes. A Hampton County Grand Jury indicted Blake for three counts of attempted murder and possession of a weapon during the commission of a violent crime. At Blake's subsequent jury trial, Blake and three family witnesses testified Blake was at the hospital on the morning of November 7 and later at his mother's house recovering from a sickle cell episode on the night of the shooting.[2] The jury rejected this alibi testimony and found Blake guilty of attempted murder as to Dobson and guilty of the lesser included offense of ABHAN as to Lakes and her unborn child. Blake was also convicted on the accompanying weapons possession charge. The circuit court sentenced Blake concurrently to fifteen years for attempted murder, fifteen years on the two ABHAN counts, and five years on the weapons charge.

**Analysis**

### I.   Batson Challenge

Blake argues the circuit court erred in in failing to conduct the third step of the *Batson* analysis when considering the State's explanations for using four of its five peremptory challenges to strike black jurors. Blake contends the State's reasons for the strikes were pretextual and asserts at least one of the strikes amounted to purposeful racial discrimination. We find no abuse of discretion.

"The trial court's findings regarding purposeful discrimination are accorded great deference and will be set aside on appeal only if clearly erroneous." *State v. Weatherall*, 431 S.C. 485, 493, 848 S.E.2d 338, 343 (Ct. App. 2020) (quoting *State v. Blackwell*, 420 S.C. 127, 148, 801 S.E.2d 713, 724 (2017)). "This standard of

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 92–95 (1986) (holding racial discrimination in jury selection violates the Equal Protection Clause of the Fourteenth Amendment and outlining the process for a challenge).

[2] Although Blake testified he had medical records to prove he was at the hospital with a sickle cell crisis on the day of the shooting, he did not provide any such records to his attorney and claimed he was unaware that he needed them for court.

review, however, is premised on the trial court following the mandated procedure for a *Batson* hearing." *State v. Cochran*, 369 S.C. 308, 312, 631 S.E.2d 294, 297 (Ct. App. 2006). "[W]here the assignment of error is the failure to follow the *Batson* hearing procedure, we must answer a question of law." *Id.* "When a question of law is presented, our standard of review is plenary." *Id.* at 312–13, 631 S.E.2d at 297.

"Other than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2238 (2019). In *Batson*, the United States Supreme Court found the Equal Protection Clause of the Fourteenth Amendment prohibits the prosecution from striking potential jurors on the basis of race. 476 U.S. at 89; *see also State v. Shuler*, 344 S.C. 604, 615, 545 S.E.2d 805, 810 (2001) ("The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the striking of a venire person on the basis of race or gender."). The Court subsequently held a criminal defendant may not exercise peremptory strikes in a racially discriminatory manner, explaining that "denying a person participation in jury service on account of his race unconstitutionally discriminates against the excluded juror." *Georgia v. McCollum*, 505 U.S. 42, 48 (1992). And, in *J.E.B. v. Alabama ex rel. T.B.*, the Court held litigants may not strike potential jurors solely on the basis of gender. 511 U.S. 127, 143 (1994). The Court found, "Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *Id.* at 140. "The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster v. Chatman*, 578 U.S. 488, 499, (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478, (2008)).

Trial courts conduct a three-step inquiry when evaluating "whether a party executed a peremptory challenge in a manner which violated the Equal Protection Clause." *State v. Inman*, 409 S.C. 19, 26, 760 S.E.2d 105, 108 (2014). Our supreme court summarized the inquiry in *State v. Giles*:

> First, the opponent of the peremptory challenge must make a prima facie showing that the challenge was based on race. If a sufficient showing is made, the trial court will move to the second step in the process, which requires the proponent of the challenge to provide a race neutral explanation for the challenge. If the trial court finds that burden has been met, the process will proceed

to the third step, at which point the trial court must
determine whether the opponent of the challenge has
proved purposeful discrimination.  The ultimate burden
always rests with the opponent of the challenge to prove
purposeful discrimination.

407 S.C. 14, 18, 754 S.E.2d 261, 263 (2014).

"Under *Batson*, once a prima facie case of discrimination has been shown by a
defendant, the State must provide race-neutral reasons for its peremptory strikes.
The trial judge must determine whether the prosecutor's stated reasons were the
actual reasons or instead were a pretext for discrimination."  *Flowers*, 139 S. Ct. at
2241; *see also State v. Cochran*, 369 S.C. at 314, 631 S.E.2d at 297–98 ("Once a
peremptory challenge is opposed, the trial court must, upon request, conduct a
*Batson* hearing and adhere to the procedures set forth in *Purkett v. Elem*, 514 U.S.
765, 767 (1995), and adopted by our Supreme Court in *State v. Adams*, 322 S.C.
114, 124, 470 S.E.2d 366, 372 (1996))."

Our supreme court has further explained:

> We likewise find, based on a harmonization of *Batson*,
> *Purkett* and *Miller-El*,[3] that in order for the explanation
> provided by the proponent of a peremptory challenge at
> the second stage of the *Batson* process to be legally
> sufficient and not deny the opponent of the challenge, as
> well as the trial court, the ability to safeguard the right to
> equal protection, it need not be persuasive, or even
> plausible, but it must be clear and reasonably specific
> such that the opponent of the challenge has a full and fair
> opportunity to demonstrate pretext in the reason given
> and the trial court to fulfill its duty to assess the
> plausibility of the reason in light of all the evidence with
> a bearing on it.  Reasonable specificity is necessary
> because comparison to other members of the venire for
> purposes of a disparate treatment analysis, which is often
> used at the third step of the *Batson* process to determine
> if purposeful discrimination has occurred, is impossible if
> the proponent of the challenge provides only a vague or

---

[3] *Miller-El v. Dretke*, 545 U.S. 231 (2005).

very general explanation.  The explanation given may in fact be implausible or fantastic, as noted in *Purkett*, but it may not be so general or vague that it deprives the opponent of the challenge of the ability to meet the burden to show, or the trial court of the ability to determine whether, the reason given is pretextual.  The proponent of the challenge must provide an objectively discernible basis for the challenge that permits the opponent of the challenge and the trial court to evaluate it.  The trial judge need not proceed to step three of the Batson process when no constitutionally permissible reason has been proffered at step two.

*Giles*, 407 S.C. at 21–22, 754 S.E.2d at 265.

While "[s]tep two of the analysis is perhaps the easiest step to meet as it does not require that the race-neutral explanation be persuasive, or even plausible[,]" step three "requires the court to carefully evaluate whether the party asserting the *Batson* challenge has proven racial discrimination by demonstrating that the proffered race-neutral reasons are mere pretext for a discriminatory intent." *Inman*, 409 S.C. at 26–27, 760 S.E.2d at 108.  "During step three, the party asserting the *Batson* challenge should point to direct evidence of racial discrimination, such as showing that the opponent struck a juror for a facially neutral reason but did not strike a similarly-situated juror of another race." *Id.* at 27, 760 S.E.2d at 108–09.  "In doing so, the party proves that the 'originally neutral reason was . . . a pretext because it was not applied in a neutral manner.'" *Id.* at 27, 760 S.E.2d at 109 (quoting *State v. Oglesby*, 298 S.C. 279, 281, 379 S.E.2d 891, 892 (1989)).

Here, the State used four of its five peremptory challenges to strike black jurors.  The impaneled jury was composed of six black jurors and six white jurors.  At the conclusion of jury selection, Blake made a *Batson* motion noting, "The State struck all black jurors, Your Honor.  My client is a black male, I think that is [a] due process violation, Your Honor, and I would ask that you elicit race neutral reasons for that being done."

When the circuit court addressed the State, the assistant solicitor responded:

Thank you, Your Honor.  I did also seat a number of black jurors, both male and female.  The first black juror that I struck[,] number 18, he was a black male.  He had a

history of traffic charges, i.e., not following the rules and he seemed a little jokey and laughey during qualifications. The second person that I struck was number 73, a black female, college student. I do not have a good experience with college students. Those jurors, I find them a little young and liberal and she was also very attractive, batting her eyelashes. And I thought perhaps she would take pity on the Defendant. Again, the next strike was juror 130, black female, also a college student. Again, I find college students to be liberal, I have not had a good experience with them on [juries]. And then finally number 4, number 164, a black female. I was informed that she actually knows a number of people in the Fairwood Apartments which is the incident location. I don't know what she has heard on the street, it has been three years, the streets talk. And that could swing either way but I just, just looking for a fair trial[,] I struck her.

In response, Blake asserted:

Yes, Your Honor. Number 18 is 31-years-old, Judge. The fact that he is jokey and laughey, I just don't see that [as] a race neutral reason. He was no more social or less social. You had a chance to observe the jurors during voir dire as the Defense and the State did. He was no more, the behavior was nothing to be noted. That is obviously a pretextual reason. In regards to number 73, Your Honor, I would like to point out that number 73 is 25-years-old, Your Honor. And this batting eye-lashing thing sounds like shucking and jiving which we have already got case law on. So I mean, that is certainly not a race neutral reason. In regards to number 130, let me turn to that. She is 21-years-old, Judge. And we have other young people that are servers in such that, she readily put on the jury who would not have the maturity of a college student or the intelligence [sic] perhaps to get into college. The fact that they put the Wild Wing server on, of course she may not be interested in higher education, I think that belittles the statement that she

made to the Court and I believe that was obviously pretextual and they were all emotional[ly] motivated, Your Honor.  And I would ask that you strike a new jury.

The circuit court denied Blake's motion, stating:

> I am going to deny your motion, [counsel].  I do find that these are race neutral reasons.  The history of traffic charges, and two being college students, the Wild Wing server who was seated and is 19-years-old is not a college student.  And number 164, I do find that it has a race neutral reason given her potential knowledge of or having heard something about these events from the folks that live in that area.  So thank you, your motion is respectfully denied.

Blake satisfied *Batson*'s first step by making the necessary prima facie showing that the challenges were based on race—four of the State's five peremptory challenges were used to strike black jurors, and Blake is also black.  In addressing the second step of the *Batson* inquiry, the State explained its reasons for each of the four strikes.  Blake then properly argued the State's explanations for striking jurors 18, 73, and 130 were pretextual.  In denying Blake's motion, the circuit court addressed the reasons the State provided for striking each of the four challenged jurors and considered whether the reasons were pretextual based on Blake's claim that the State sat at least one similarly situated white juror.  This is exactly what the third step of the *Batson* procedure necessitates.  *See Giles*, 407 S.C. at 18, 754 S.E.2d at 263 ("If the trial court finds that burden has been met, the process will proceed to the third step, at which point the trial court must determine whether the opponent of the challenge has proved purposeful discrimination.  The ultimate burden always rests with the opponent of the challenge to prove purposeful discrimination.").

As to the specifics of each of the four strikes, once the State explained that it struck Juror 164 because she knew and was familiar with several people from the apartment complex in the area of the shooting, Blake made no further argument as to Juror 164.  And, Blake did not challenge the State's first reason for striking Juror 18—his history of traffic offenses.  However, Blake did argue the "jokey and laughey" behavior referenced by the State was not a proper basis for a strike.  *But see State v. Wilder*, 306 S.C. 535, 538, 413 S.E.2d 323, 325 (1991) ("A Solicitor may strike veniremen based on their demeanor and disposition.").  Thus, the circuit

court clearly acted within its discretion in accepting the State's race-neutral reasons for striking Jurors 18 and 164.

As for Jurors 73 and 130, while Blake makes a strong argument that the age of the college students matches the young age of the seated white Wild Wing server, youth was not the primary reason the assistant solicitor gave to support the State's striking of the two college students. The assistant solicitor was quite specific in her reasoning, explaining she found college students to be liberal, she had "not had a good experience with them" as jurors, and she was concerned the juror "batting her eyelashes" might take pity on Blake. *See Wilder*, 306 S.C. at 538, 413 S.E.2d at 325 (holding a party may strike a potential juror "based on their demeanor and disposition"); *People v. Perez,* 29 Cal.App.4th 1313, 1328, 35 Cal.Rptr.2d 103, 111 (1994) (finding limited life experience of prospective jurors who were college students justified prosecutor's exercise of peremptory challenges, rather than the prospective jurors' Hispanic origin). Mindful of our standard of review, we find the circuit court did not abuse its discretion in accepting the solicitor's explanations for striking the two college students. Still, as to Juror 73, while we fail to see how batting one's eyelashes equates to the clearly repugnant reference to "shucking and jiving," we acknowledge striking a juror because of her physical appearance could suggest purposeful discrimination in other contexts. *See State v. Tomlin*, 299 S.C. 294, 299, 384 S.E.2d 707, 710 (1989) (reversing defendant's conviction upon finding trial court failed to inquire into the State's explanation that the juror was struck because he "shucked and jived," which demonstrated the prosecutor's subjective intent to discriminate and clearly violated *Batson*)), *holding modified by State v. Adams*, 322 S.C. 114, 470 S.E.2d 366 (1996). But Blake did not challenge the strike on the basis of Juror 73's gender; thus, we need not further examine this aspect of the strike. *See Shuler*, 344 S.C. at 615, 545 S.E.2d at 810 (referencing prohibition of strikes based on race or gender."); *but see Wilder*, 306 S.C. at 538, 413 S.E.2d at 325 (noting a proper strike may be based on "demeanor and disposition.").

Notably, the jury impaneled here was composed of six black jurors and six white jurors. *See Shuler*, 344 S.C. at 621, 545 S.E.2d at 813 ("[T]he composition of the jury panel is a factor that may be considered when determining whether a party engaged in purposeful discrimination pursuant to a *Batson* challenge."). Other than as discussed above, Blake failed to provide examples of seated jurors similarly situated to those the State excused. Accordingly, we find no error in either the circuit court's conducting of the *Batson* procedure or its finding that Blake did not demonstrate purposeful discrimination.

## II.     Opening the Door

Blake next argues the circuit court erred in allowing the State to cross-examine him about an unrelated domestic violence incident during which an investigator saw Blake dragging Dobson's older sister—the mother of Blake's child—from the woods by her hair.

"The admission or exclusion of evidence is a matter within the trial court's sound discretion, and an appellate court may disturb a ruling admitting or excluding evidence only upon a showing of 'a manifest abuse of discretion accompanied by probable prejudice.'" *State v. Dennis*, 402 S.C. 627, 635, 742 S.E.2d 21, 25 (Ct. App. 2013) (quoting *State v. Douglas*, 369 S.C. 424, 429, 632 S.E.2d 845, 847–48 (2006)).  An appellate court "will not disturb a trial court's ruling concerning the scope of cross-examination of a witness to test his or her credibility, or to show possible bias or self-interest in testifying, absent a manifest abuse of discretion." *State v. Hawes*, 423 S.C. 118, 135, 813 S.E.2d 513, 522 (Ct. App. 2018) (quoting *State v. Gracely*, 399 S.C. 363, 371, 731 S.E.2d 880, 884 (2012).  Similarly, "[w]hether a person opens the door to the admission of otherwise inadmissible evidence during the course of a trial is addressed to the sound discretion of the trial judge." *State v. Page*, 378 S.C. 476, 483, 663 S.E.2d 357, 360 (Ct. App. 2008). "An abuse of discretion occurs when a trial court's decision is unsupported by the evidence or controlled by an error of law." *State v. Makins*, 433 S.C. 494, 500–01, 860 S.E.2d 666, 670 (2021).

Pretrial, Blake questioned whether the State intended to introduce evidence of prior bad acts.  The State responded:

> The only conviction that I see on his record is a 2014 public disorderly conduct[,] which does not fall under the rules to use against him.  As far as prior bad acts, I do not intent to get into any, unless he should open the door[.]  I do intent to ask some of the witnesses if they know what the relationship between Mr. Blake and Mr. Dobson is without getting into the details.  They had some problems together.  They did not get along, not going to go into the details of why they didn't get along.  But any prior difficulties are animus between the parties, without getting into the details, are appropriate things to address with witnesses when we have an attempted homicide.  It goes to motive and identity.  And, again, not going into

the details so it is not a 404(b) analysis.  It is just a relevance analysis.

During his direct examination, Blake testified he has a one-year-old son (Nephew)[4] with Dobson's older sister, Delisha, but admitted he was also seeing another woman while in that relationship.  Blake further testified that in April 2015, Dobson shot out the back window of Blake's car, likely because he was "running around with Delisha."  Although Blake initially reported the incident to law enforcement and gave a statement, he chose not to pursue the charges.  Defense counsel asked Blake about the April shooting and Blake's resolution of his conflict with Dobson:

> Q.  Eventually did y'all have a discussion about that?
>
> A.  Yes, sir.  We came to a conclusion to wash off the situation.
>
> Q.  Did you explain to him [Dobson] that, you know, you needed to see your baby?
>
> A.  Yes, sir.
>
> Q.  He's the uncle?
>
> A.  Yes, sir.
>
> Q.  So there, the better problem to start with.  But whatever the problem was in [Dobson's] mind, did you believe it was solved?
>
> A.  Yes, sir.

At the conclusion of his direct examination, Blake was asked whether he thought "there would be anything wrong with a child spending time with his father" and

---

[4] Blake's son was born on February 3, 2017; the child's birthdate is relevant because Blake claimed he and Dobson had settled their differences for the sake of the child prior to the shooting for which Blake was being tried.  But the offenses for which Blake was on trial occurred on November 7, 2015—more than a year before Nephew's birth.

whether that would be a normal thing to happen in society. Blake agreed there would be nothing wrong with that and it would indeed be normal.

On cross-examination, Blake conceded his problems with Dobson had nothing to do with Blake's fathering of Nephew and admitted the child was not born until 2017, nearly two years after Dobson shot at Blake's car and some fifteen months after the shooting that injured Lakes and her baby.

Defense counsel again asked on redirect about Blake's relationship with Delisha and its relevance to the animus with Dobson:

> Q. Okay. And the truth is, you've been running around with Delisha for years?
>
> A. Yes, sir.
>
> Q. And her brother knew that?
>
> A. Yes, sir.
>
> Q. Okay. And is that what he was mad about?
>
> A. Could have been.
>
> Q. Okay. But there shouldn't have been any problems in November?
>
> A. No, sir.

The State requested re-cross and inquired:

> Q. [Defense counsel] asked you if [Dobson] could have possibly been mad about you running around on his sister, Lisha Dobson, right?
>
> A. Yes ma'am. He did.
>
> Q. Right. And so you said, yeah, that's probably what he was mad about, correct?

A. I said could have been.

Q. Could have been?  So it could have been something else, too, right?

A. Like?

Q. I'm glad you asked me.  It could have been when Investigator Michael Thomas found you dragging her out of the woods by her hair, correct?

Blake immediately objected, and the circuit court excused the jury.  Referencing his pretrial inquiry regarding whether the State intended to ask about prior bad acts, Blake emphasized the solicitor's response that she did not intend to raise such unless Blake opened the door.  Blake argued the State misled the court, there was no evidence to support the investigator's allegation, and the State was trying to offer extrinsic evidence to prove a point from another witness.  However, the State countered that Blake opened the door when he testified Dobson could have been angry that Blake was running around on Delisha and declined to marry her.  The solicitor noted, "[Blake] himself asked me like what else is there.  He was there.  He knows.  This is proper cross-examination.  This explores the relationship between the parties and the motive that [Dobson] had and Mr. Blake has in shooting [Dobson]."  After hearing further arguments, the circuit court asked,

Tell me, [counsel] how you didn't open the door when you asked all manner of questions about the reason [Dobson], wasn't he upset with you because you were running around on his sister and had a baby with his sister while [you were] in another relationship.  How does that not open the door?

The parties further discussed the prior incident, including who witnessed it and its timing.  The circuit court then allowed the question but cautioned, "I'm not giving free rein on this.  This is for a very narrow purpose."[5]

---

[5] During this discussion, the State noted it also planned to present rebuttal testimony from the investigator who witnessed the hair dragging incident; however, the circuit court declined to allow such testimony.

Once the jury returned, the solicitor asked, "All right. So [Mr. Blake], the last question to you was that [Dobson]'s problem with you could not have possibly arisen from how you treated his sister and you at one point were pulling her by her hair from the wood line?" Blake responded:

> A. How would he know how I am treating his sister? How [does] he know what our personal life, what we have going on?
>
> Q. Okay.
>
> A. Second, do you have a statement or proof of me dragging Delisha by her hair? You got me on camera doing that to her? Somebody seeing me do that to her? Did she write, tell you that I did that to her?

During the redirect following this inquiry, Blake's counsel emphasized the State had shown Blake no statement, video, or police report to support its questioning.

"When an accused takes the stand, he becomes subject to impeachment, like any other witness." *Hawes*, 423 S.C. at 135, 813 S.E.2d at 522 (quoting *State v. Major*, 301 S.C. 181, 183, 391 S.E.2d 235, 237 (1990)). Had the State initially sought to question Blake about "dragging [Delisha] out of the woods by her hair," without Blake's own testimony, such would have been inadmissible under Rules 403 and 404. But because Blake testified Dobson previously shot at him, implied he was clueless as to exactly why he and Dobson had problems, and indicated the two men had resolved their differences for the sake of a baby who had not yet been born, the circuit court did not abuse its discretion in concluding Blake opened the door for the State's question addressing a possible reason for the enmity between the two men. *See State v. Culbreath*, 377 S.C. 326, 333, 659 S.E.2d 268, 272 (Ct. App. 2008) (reiterating "a defendant may open the door to what would be otherwise improper evidence through his own introduction of evidence or witness examination").

The State was permitted to respond to Blake's incomplete—and demonstrably false—explanation regarding his conflict with Dobson by eliciting testimony to show Blake's problems with Dobson did not begin with Dobson shooting at him. To the contrary, the prior shooting was merely one incident in the ongoing conflict between the two men, going at least as far back as Blake's assault on Dobson's sister. *See State v. Stroman*, 281 S.C. 508, 513, 316 S.E.2d 395, 399 (1984)

("Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though [the] latter evidence would be incompetent or irrelevant had it been offered initially." (quoting *State v. Albert*, 277 S.E.2d 439, 441 (N.C. 1981))).  The State sought to question Blake about the prior assault in an effort to discern the true source of the hostile relationship only after Blake introduced evidence of Dobson's prior act of shooting at Blake and the purported resolution of the matter.

Finally, the State's limited cross-examination addressing the prior assault on Dobson's sister became necessary only after Blake's direct examination effort to demonstrate his good character as a peaceful and family-focused man.  Blake claimed that rather than press charges against Dobson, he sought to make peace with him for Nephew's sake.  This was clearly false, because Nephew had not yet been born and because Blake told others at the time of the incident that he would "take care of it."  For these reasons, we find the circuit court did not abuse its discretion in permitting the State's limited cross-examination of Blake regarding this particular conduct for the "very narrow purposes" of challenging Blake's testimony and establishing the context of his problematic relationship with Dobson.  *See State v. Young*, 378 S.C. 101, 106, 661 S.E.2d 387, 389 (2008) ("[W]hen the accused offers evidence of his good character regarding specific character traits relevant to the crime charged, the solicitor has the right to cross-examine him as to particular bad acts or conduct.").

**Conclusion**

Blake's convictions for attempted murder, ABHAN, and possession of a weapon during the commission of a violent crime are

**AFFIRMED.**

**WILLIAMS, C.J. and LOCKEMY, A.J., concur.**