# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Kenneth Ray Gleaton, Appellant.

Appellate Case No. 2019-002072

———————

Appeal From Richland County
L. Casey Manning, Circuit Court Judge

———————

Opinion No. 6086
Heard May 9, 2023 – Filed August 28, 2024

———————

## AFFIRMED

———————

Appellate Defender Kathrine Haggard Hudgins, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody J. Brown, and
Assistant Attorney General Julianna E. Battenfield, all of
Columbia, for Respondent.

———————

**MCDONALD, J.:** Kenneth R. Gleaton appeals his life sentence and convictions
for murder, second-degree arson, illegal possession of a firearm, and desecration of
human remains. He claims numerous trial errors, including the circuit court's
denial of his motion to bifurcate and the handling of certain evidentiary matters.
Gleaton further challenges the circuit court's conduct of the trial, such as its refusal
to recess late on a Friday afternoon before proceeding with closing arguments and

the charge to the jury, as well as the court's failure to hold a meaningful sentencing proceeding to allow the presentation of mitigation evidence. Finally, Gleaton contends these cumulative errors require that he be granted a new trial. Although the circuit court erred in certain respects during this week-long trial, we find these errors harmless based on our review of the entire record. Thus, we affirm Gleaton's convictions and life sentence.

**Facts and Procedural History**

Just before midnight on October 9, 2017, Richland County Emergency Services responded to a call reporting a fire at the home of Amanda Peele (Victim). When first responders arrived, they found Victim's badly burned body in her bedroom. Upon examining Victim and noticing a belt wrapped tightly around her neck, the paramedic crew chief alerted law enforcement and Deputy Coroner Susan Acerra, who pronounced Victim dead at the scene.

In addition to examining the scene, Richland County Sheriff's Department (RCSD) investigators collected a gunshot residue (GSR) kit from eyewitness Roderick "Mike" Dukes. RCSD Senior Investigator Ronnie Hinson also spoke with Dukes before transporting him to the Pineview Station for a more formal interview. Investigator Hinson then secured arrest warrants for Gleaton on murder and arson charges.

The following day, Michael Shuler and his girlfriend were teaching their dog to swim in the Congaree River when they saw a man—whom Shuler later identified as Gleaton—under the Gervais Street bridge. Gleaton approached Shuler and started a conversation; he mentioned his girlfriend had "just died" and claimed he wanted to transfer some photographs to a new cell phone. After Shuler showed Gleaton how to reuse the SIM card from his old cell phone to save the photos, Gleaton removed the card from one of the phones and tossed the phone into the river. He then returned to his initial spot under the bridge. Shortly after this interaction, law enforcement arrived and arrested Gleaton.

Gleaton provided a written statement after his arrest; he admitted to having an argument with Victim on the evening of October 9 but denied placing a belt around her neck, killing her, or setting her house on fire. Gleaton told the officers Victim went to bed after taking some pain medication and noted Dukes was with him at Victim's house. Gleaton further admitted to taking his clothes and electronics from Victim's home and stashing them in the woods before walking to his friend Cyril "Roy" Brasley's house and later sleeping under the bridge. The following morning,

Gleaton returned to Brasley's house, where Brasley gave him a clean pair of shorts and twenty dollars. Finally, Gleaton admitted to law enforcement that he took Victim's cell phone and threw it in the river because it "wasn't any use to [him]."[1]

In April 2018, the Richland County Grand Jury indicted Gleaton for murder and first-degree arson; the State subsequently amended the arson charge to second-degree.[2] In June 2019, Gleaton was indicted for possession of a firearm by a person convicted of a violent felony and desecration of human remains. His jury trial began on Monday, October 28, 2019.

Following jury selection, the circuit court addressed preliminary issues regarding prior incidents of domestic violence between Gleaton and Victim. The State first proffered the testimony of Victim's son (Son), who testified in camera that he had seen Gleaton with a "silver [gun] with a brown handle," specifically "a .25 auto," "like five, six times." Son also testified Victim once told him that Gleaton held a gun to her ribs and showed Son the imprint of a "gun barrel on her right side in her ribs." Next, the State called Victim's coworker and roommate, Jessica Gantt, to proffer testimony that Gleaton previously threatened to kill Victim and assaulted Victim with a gun. After hearing arguments, the circuit court ruled Son could testify to "what he saw [and] heard, but [could not] speculate" and that Gantt's testimony would be allowed. Defense counsel asked the court to "make a prejudicial versus probative finding on the record," to which the court replied, "I

---

[1] Investigators later recovered the phone from the river.

[2] Section 16-11-110 (B) of the South Carolina Code (Supp. 2022) provides,

> A person who wilfully and maliciously causes an explosion, sets fire to, burns, or causes to be burned or aids, counsels, or procures a burning that results in damage to a dwelling house, church or place of worship, public or private school facility, manufacturing plant or warehouse, building where business is conducted, institutional facility, or any structure designed for human occupancy including local and municipal buildings, whether the property of the person or another, is guilty of the felony of arson in the second degree and, upon conviction, must be imprisoned not less than three nor more than twenty-five years.

think the probative value outweighs the prejudicial effect. Anything further? And it's by clear and convincing evidence for the record."

Before the jury, RCSD Patrol Deputy Phillip Carlson testified he responded to a domestic violence call from Victim on September 8, 2017.[3] Deputy Carlson met Victim, whom he described as "distraught," at a hotel on Garners Ferry Road. After their interview, Deputy Carlson helped Victim gather some of her belongings before escorting Victim and Son to a shelter for victims of domestic violence.

Dukes testified he met Victim in the summer of 2017 through her grandparents, who hired him to do yard work and odd jobs.[4] Dukes befriended Victim, her grandparents, and Gleaton, and he began hanging out at their house almost daily. After spending time with the family for a few months, Dukes observed Victim and Gleaton's relationship was deteriorating. Dukes also noted Victim's grandparents and children moved out, but he never learned why they left.

On the day of the murder, Dukes went with Gleaton to Victim's house because Gleaton wanted to reconcile with her following another argument. When they arrived, Victim was getting ready to take Gantt to Waffle House for her work shift, so Dukes and Gleaton left.[5] The two men returned to Victim's house about an hour later. Because Gleaton wanted to talk with Victim, Dukes went out on the back porch before returning to the living room to play a video game. A short time later, Dukes heard a gunshot and went outside to look around. Seeing nothing suspicious, Dukes went back inside and approached Victim's bedroom where he believed Gleaton and Victim were talking. Dukes testified that when he opened the bedroom door, "There was blood everywhere in the room. [Gleaton] had his foot on her head. He was choking her with a belt. She was dead. She was already dead when I opened the door."

---

[3] The circuit court overruled defense counsel's Rule 404(b) and 403, SCRE, objections to Deputy Carlson's testimony.

[4] Dukes has a criminal record that includes giving false information to obtain an identification card in 2009, giving false information to police in 2010, failure to return a rented object in 2010, and grand larceny in 2012.

[5] Gantt testified Gleaton came over around 4:30 PM and Victim took her to work around 7:00 PM.

Dukes further explained that as he approached, Gleaton stated:

> I done f\*\*ked up or something.  He said something of
> that nature, or he had screwed up, but when I went into
> the room, he didn't say anything to me.  I didn't give him
> a chance to say anything to me.  When I went into the
> room, I hurried up and took control of the situation and
> told him I was gonna get some bags so he could clean up.

Instead, Dukes fled through the woods to a gas station, where he used the store Wi-Fi to contact his friend Latoya Riley through Facebook Messenger.  In the messages, which were introduced at trial, Dukes exclaimed, "Toya I need you!!!!!!!  Please come get me now!!!!!!!!"

When Riley arrived, Dukes told her Gleaton had killed Victim.  Dukes testified he was "scared for his safety" and "needed to get out of the area."  Dukes also told Riley about Victim's roommate, and Riley decided they needed to find Gantt and "tell her because [Gleaton] could be at the house waiting for her when she gets home from work."  Dukes went inside Waffle House to warn Gantt, and Riley called 911.  Gantt then called Victim's cell phone, which Gleaton answered.  Gantt asked to speak to Victim but Gleaton said she had taken some pills and fallen asleep.  Once Gantt pressed him and accused him of killing Victim, Gleaton lost his composure and demanded to know who told her.  Gantt then hung up and demanded that Riley and Dukes take her to Victim's house.

When the three arrived, Victim's house was on fire and first responders were on the scene.  Riley told law enforcement Dukes "would know what happened because he was already here."  Dukes willingly gave a GSR sample, spoke with Investigator Hinson at the scene, and went to the station to provide a written statement.[6]

Dukes continued to message Riley the following day.  He told her he found one of Gleaton's "bloody bags" containing some shirts in the woods near the pond where Dukes and Gleaton fished.  He also messaged, "I should've been [sic] got the gun from him."

---

[6] Both Riley and Gantt testified Dukes was in shock and did not smell of smoke.  By contrast, the RCSO officers who interacted with Gleaton the day after the murder observed that he smelled "like a camp fire."

Gantt testified she moved in with Victim on September 6, 2017, approximately a week before Victim's grandparents moved out. The day after her arrival, Gantt saw Gleaton pull a silver pistol out of his pants and hide it in a "little boot." Gantt explained that Victim asked her grandparents to leave because she believed they called the Department of Social Services (DSS) to remove her children following a violent incident with Gleaton.

Describing this prior incident, Gantt recalled hearing loud voices while she was getting ready for work in her room. Victim and Gleaton then drove Gantt to Waffle House for work. Victim parked out front, jumped from her car, and ran inside. She never exited the building, and Gantt was unable to find her. While Gantt was outside smoking a cigarette before her shift, police cars pulled into the parking lot and Gleaton ran past her as the police chased him. Gleaton told Gantt, "[T]ell her when you see her or talk to her again she's dead. I'll kill her."

The day after making this threat, Gleaton showed up at Victim's house. He sat down at the kitchen table and asked Gantt whether Victim told her what had occurred. Gantt revealed that Victim told her Gleaton pulled a gun on her; she further testified Gleaton acknowledged this by nodding "yes."[7] Although Gleaton later resumed living at Victim's home, Victim asked him to leave approximately one week before her murder.

Roy Brasley, a Columbia celebrity hair stylist and Gleaton's former employer,[8] recalled that late in the evening of October 9, Gleaton came to his house stating he had argued with Victim and needed to lie down. Gleaton asked Brasley for a pair of shorts and fell asleep on his couch.[9] The next morning, Gleaton brought up going to Texas for work associated with the Houston flood relief effort, an idea Gleaton and Brasley had previously discussed due to Gleaton's ongoing problems with Victim. Brasley gave Gleaton some money for breakfast and went to work, where he received a call reporting the police were at his house and officers were on

---

[7] Defense counsel objected to the admission of this interaction as hearsay. The State replied that the "statement" was admissible because Gleaton adopted and acknowledged its truth. The circuit court overruled the hearsay objection.

[8] Brasley met Gleaton through Columbia flood relief work in late 2015.

[9] According to Gleaton's statement to law enforcement, his own shorts "had [his] blood on them from where [he] cut [his] finger."

the way to his shop.  When the officers arrived, they gave few specifics, other than that they were investigating a death and a fire and needed to speak with Gleaton immediately.

Approximately an hour later, Gleaton came to Brasley's shop seeking money for a bus ticket.  As the two talked, Gleaton told Brasley about his recent altercation with Victim.  About seven or eight minutes into this discussion, "something clicked in [Brasley's] mind to record the conversation."  Brasley recorded Gleaton's subsequent admissions to hitting Victim and setting fire to her home:

> Gleaton: It didn't go down by myself, man.
>
> Brasley: It don't [sic] matter if it went down by yourself or not.  Why did you do it?  What the f**k happened?
>
> Gleaton: Roy.  Dog.  It just happened.
>
> Brasley: What do you mean it just happened?
>
> Gleaton: Like everything went sideways, man.  We got into it and, and she got hit and then—
>
> Brasley: Who hit her?
>
> Gleaton: I slapped her and then we got into it and then with [Dukes] and everything and then it went sideways.
>
> Brasley: What did [Dukes] do to her?
>
> Gleaton: I don't know.  I left.  I did what I did and I left.
>
> Brasley: What did you do?
>
> Gleaton: I told you I set the house on fire [inaudible].

Victim's grandfather, Harry Coulter, testified about several events that occurred during the final months of Victim's life.  For most of 2016, Coulter and his wife lived with Victim and her children.  During that time, Gleaton began dating Victim and moved in to her home.  While living with Victim, Coulter owned a .25 caliber handgun, which he testified was silver with a brown wooden handle.  In September

2017, after Son found the gun in Coulter's vehicle, Victim took it from him and instructed Gleaton to toss it in the small pond behind the house. It appears Gleaton ignored this request, for Son testified he saw Gleaton with the gun at least five times after his mother asked Gleaton to dispose of it.

Son also testified about the weeks leading up to Victim's death. In September 2017, Son and his brother lived with Victim until DSS placed them in foster care.[10] However, before Son was removed from her home, Victim told him about a violent incident with Gleaton. Son observed his mother was scared, bruised, and had the imprint of a gun barrel "on her right side in her ribs."

Jerry Nisky of the Richland County Fire Marshal's Office investigated the fire at Victim's home shortly after it was extinguished and again the following morning. Investigator Nisky testified the fire started in the bedroom and had four separate points of origin within the house, including the bed where law enforcement found Victim's body. Each point of origin had an open flame ignition source, such as a lighter,[11] but no accelerant was used; instead, the open flame sources ignited readily combustible material in the home, including Victim's bedding. Forensic pathologist Amy Durso testified Victim did not die in the fire but from a combination of a blow to her head, strangulation, and two gunshot wounds.

The jury convicted Gleaton on all four indictments, and the circuit court sentenced him concurrently to life in prison for murder, twenty years for second-degree arson, five years on the firearm charge, and ten years for desecration of human remains. Gleaton subsequently filed a motion for a new trial and sentencing hearing, which the circuit court denied. Gleaton timely appealed.

**Standard of Review**

"In criminal cases, appellate courts sit to review errors of law only." *State v. Robinson*, 426 S.C. 579, 591, 828 S.E.2d 203, 209 (2019). "As to evidentiary issues, 'we are limited to determining whether the trial judge abused his discretion.'" *State v. Hawes*, 423 S.C. 118, 126, 813 S.E.2d 513, 517 (Ct. App. 2018) (quoting *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001)). "A court's ruling on the admissibility of evidence will not be reversed on appeal absent

---

[10] The brothers were later placed with their father.

[11] A pink lighter was recovered from Victim's bedroom.

an abuse of discretion or the commission of legal error, which results in prejudice to the defendant." *State v. Torres*, 390 S.C. 618, 625, 703 S.E.2d 226, 230 (2010). Likewise, "[t]he conduct of a criminal trial is left largely to the sound discretion of the trial judge, who will not be reversed in the absence of a prejudicial abuse of discretion." *State v. Bryant*, 372 S.C. 305, 312, 642 S.E.2d 582, 586 (2007); *see also State v. Heath*, 232 S.C. 384, 391, 102 S.E.2d 268, 272 (1958) ("Necessarily the conduct of a trial is largely within the discretion of the presiding judge, to the end that a fair and impartial trial may be had."). "An abuse of discretion occurs when a trial court's decision is unsupported by the evidence or controlled by an error of law." *Bryant*, 372 S.C. at 312, 642 S.E.2d at 586.

**Analysis**

## I.   Denial of Gleaton's Motion to Bifurcate

Gleaton argues the circuit court erred in declining to bifurcate the proceedings with regard to his indictment for possession of a firearm by a person convicted of a violent felony. Gleaton contends a jury should first determine possession before the State is permitted to introduce evidence of the predicate violent felony conviction. We disagree.

Generally, "a bifurcated proceeding is not required in a non-capital case." *Chubb v. State*, 303 S.C. 395, 397, 401 S.E.2d 159, 161 (1991). "[A bifurcated trial] is not required by either the common law, the statutory law, or the constitution of this State." *State v. Bennett*, 256 S.C. 234, 242, 182 S.E.2d 291, 295 (1971).

Gleaton was indicted for violating section 16-23-500(A) of the South Carolina Code (Supp. 2023), which makes it unlawful for a person convicted of a violent felony "to possess a firearm or ammunition within this State." Because a prior violent felony conviction is an element of the crime, Gleaton's counsel moved to bifurcate for the jury to first consider the element of possession before learning of the predicate felony conviction. The circuit court denied this motion.

Alternatively, defense counsel offered to stipulate to Gleaton's prior conviction. The State declined the stipulation offer but agreed to reference only a prior violent felony conviction and to omit that the prior conviction was for arson. The circuit court overruled Gleaton's objection to the State's proposal, stating, "You know, I don't want to sound curt or anything, [but] I read these motions and I don't know how you keep me from mentioning the indictment." Still, the court ruled that if the

parties had agreed not to mention the specifics of the felony, simply referring to Gleaton's prior conviction as a "violent felony" would suffice. Investigator Hinson testified Gleaton was convicted of a prior violent crime in 1996. The circuit court later instructed the jury:

> Now, another indictment charges the Defendant, Mr. Gleaton, with unlawful possession of a firearm by a person convicted of a violent offense. It is unlawful for a person who has been convicted of a violent crime to possess a firearm or ammunition within this State. There was a stipulation at the beginning of the trial that Mr. Gleaton had been convicted of a violent crime.

Gleaton cites *State v. Cross*, 427 S.C. 465, 832 S.E.2d 281 (2019), as support for his argument that the State's referencing of a "prior violent felony" conviction—rather than naming the prior arson conviction—did not eliminate the improper prejudicial effect upon the jury. In *Cross*, a case decided in the months before Gleaton's trial, our supreme court addressed the circuit court's refusal to bifurcate the trial of a charge for first-degree criminal sexual conduct (CSC) with a minor where a prior conviction for CSC with a minor was an element of the offense. Reversing the conviction, the supreme court explained:

> Here, the probative value of the evidence of the prior conviction is undeniable, as the State must prove the conviction as an element of the crime charged. However, even evidence with such significant probative value remains subject to the application of Rule 403, and the trial court is duty-bound to determine whether the probative value of this evidence is substantially outweighed by one or more of the considerations identified in Rule 403. Evidence of the 1992 conviction is in no way probative of the threshold issue of whether Cross committed a sexual battery upon Minor in 2005. Necessarily, therefore, the question of <u>when</u> evidence of the prior conviction should be admitted comes sharply into focus. In this case, the integrity of Rule 403 and the obligation of the State to introduce necessary evidence are both salvaged by the application of Rule 611(a), SCRE . . . . Under the facts before us, Rule 611(a) required the trial court to exercise control over the order

of presenting evidence in such a way that (1) allowed the
State to prove an element of the crime, and (2) at the
same time guarded against a violation of Rule 403.

427 S.C. at 479, 832 S.E.2d at 288-89.

While Gleaton acknowledges his case involves a prior violent felony conviction
with no reference to the specifics of the violent felony at trial, he argues the
supreme court's reasoning in *Cross* should still apply. However, Gleaton was
neither on trial for a sex-related offense nor was his prior conviction related to a
sex crime. *See Cross*, 427 at 478, 832 S.E.2d at 288 (distinguishing the analysis of
Cross's CSC with a minor indictment from its first-degree burglary cases "because
of the inherently prejudicial stigma a prior sex-related offense undoubtedly
carries"). Additionally, witness credibility was not the critical issue in Gleaton's
trial, as it was in *Cross*. Gleaton did not testify, and the testimony of the State's
witnesses was supported by other admitted evidence, including Brasley's video
recording in which Gleaton admitted he struck Victim and set fire to her home. In
order to prove Gleaton's guilt on the firearm possession offense, the State was
required to submit evidence that he was previously convicted of a violent felony.
*See In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects
the accused against conviction except upon proof beyond a reasonable doubt of
every fact necessary to constitute the crime with which he is charged."); *State v.
Green*, 261 S.C. 366, 371, 200 S.E.2d 74, 77 (1973) ("[E]vidence logically relevant
to establish a material element of the offense charged is not to be excluded merely
because it incidentally reveals the accused's guilt of another crime."); *State v.
Cheatham*, 349 S.C. 101, 106, 561 S.E.2d 618, 621 (Ct. App. 2002) ("Evidence of
other crimes is admissible to establish a material fact or element of the crime
charged."). As the probative value of admitting evidence of Gleaton's unspecified
predicate felony conviction was not substantially outweighed by the danger of
unfair prejudice, the circuit court did not err in denying the motion to bifurcate.

## II.    Photographs Admitted at Trial

Gleaton next argues the circuit court erred in admitting crime scene photographs of
Victim's naked, burned body; autopsy photographs; and a photograph of Victim
prior to her death. He claims any probative value the photographs had was
substantially outweighed by the danger of unfair prejudice.

"The relevancy, materiality, and admissibility of photographs as evidence are
matters left to the sound discretion of the trial court." *State v. Johnson*, 338 S.C.

114, 122, 525 S.E.2d 519, 523 (2000).  "However, photographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or unnecessary to the issues at trial."  *Id.*  "The criteria is not . . . that photographs become inadmissible because they graphically depict a gruesome scene.  Rather, the question is whether the photographs are unfairly prejudicial so as to outweigh the probative value."  *State v. Jones*, 440 S.C. 214, 891 S.E.2d 347 (2023) (quoting *State v. Franklin*, 318 S.C. 47, 55, 456 S.E.2d 357, 361 (1995)).  "'To be classified as unfairly prejudicial, photographs must have a 'tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.'"  *State v. Torres*, 390 S.C. 618, 623, 703 S.E.2d 226, 228-29 (2010) (quoting *Franklin*, 318 S.C. at 55, 456 S.E.2d at 361).  "We review a trial court's decision regarding Rule 403 pursuant to the abuse of discretion standard and are obligated to give great deference to the trial court's judgment."  *State v. Collins*, 409 S.C. 524, 534, 763 S.E.2d 22, 28 (2014) (quoting *State v. Adams*, 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003)).

## A. Black and White Crime Scene Photographs

Gleaton objected to six color photographs taken at the crime scene that the State sought to admit at trial.  The circuit court initially ruled the photos were not admissible but then stated, "I may, you know, I might change my mind but just looking at them[,] give me your basis for why I should admit these photos."  The following exchange later occurred:

> [State]: The coroner would be testifying to these, Your Honor, in terms of what the body looked like when the coroner first saw the body in terms of the markings—
>
> [Court]: Why didn't you get black and white photos as a substitute to the color ones?  Do you have black and white photos?
>
> [State]: We do not.  They were given to us in color, Your Honor.
>
> [Court]: Can't you have them changed to black and white?  These are gruesome.
>
> [State]: We can go do that if you would like, but we need like five minutes to do so.

. . . .

    [Court]: All right.  I think if they were black and white they would be admissible.

    [State]: Okay.  Well, we can go make them in black and white, Your Honor, and then have the discussion.

    [Court]: Well, let's do them in black and white and I'll take a look at them and if it takes all day, it takes all day, if it takes all week, it takes all week.  It doesn't matter. Let's do one thing at a time.  I think those as depicted in color are a little too gruesome.  Black and white I think would be a little bit better and not as inflammatory.

Gleaton also objected to the substituted black and white photos on several grounds, asserting, "We still object to them . . . .  in black and white.  They're still gruesome. They're still overly prejudicial.  They're not probative to anything in issue in this case.  The coroner can testify what the body looked like when she arrived and what she observed."  As the parties discussed the relevant authorities with the court, Gleaton further objected to the photos as duplicative.  The circuit court responded, "All right.  You have objected three times.  My decision has not changed."  Then, without further analysis, the circuit court denied Gleaton's motion to exclude the black and white photos of Victim's body taken at the crime scene.

Appellate courts are often tasked with considering whether a trial court's admission of graphic photographs constitutes prejudicial error.  In *Collins*, the circuit court admitted into evidence seven pre-autopsy photographs of a child who died of "extensive traumatic injury" after being mauled by dogs.  409 S.C. at 528-33, 763 S.E.2d at 25-27.  This court reversed, finding the circuit court erroneously admitted the photographs and the error was not harmless.  *Id.* at 533, 763 S.E.2d at 27. However, our supreme court reversed and reinstated the conviction, finding the photographs were "highly probative, corroborative, and material in establishing the elements of the offenses charged; [their] probative value outweighed [their] potential prejudice; and the appellate court should not have invaded the trial court's discretion in admitting this crucial evidence based on its emotional reaction to the subject matter presented."  *Id.* at 534-35, 763 S.E.2d at 28.

In *Hawes*, this court found photographs taken at a crime scene established the circumstances of the scene and corroborated the testimony of both the victim's next-door neighbor and the crime scene investigator. 423 S.C. at 130, 813 S.E.2d at 519. There, the victim's duplex neighbor woke to sounds of "screaming and physical violence" and called 911. *Id.* He described an initial wave of violence in the victim's bedroom and testified, "it then progressed toward the kitchen area where 'there was a second wave of more aggressive, just brutal, carnal[,] instant violence.'" *Id.* at 130, 813 S.E.2d at 519-20. He discussed "physically feel[ing] the vibration in [his] bedroom from what was coming from [Victim's side of the duplex] . . . . [and he] could hear what sounded like a table slamming against the wall, like her body being thrown against the wall." *Id.* at 130, 813 S.E.2d at 520. The last thing the neighbor heard was the victim yelling "no, no, no" and "pleading for her life." *Id.* The crime scene investigator who photographed and recorded the crime scene testified in detail regarding the conditions of the scene as well as the evidence collected. *Id.* at 130-31, 813 S.E.2d at 520. Finding the circuit court did not abuse its discretion in admitting the crime scene photos, this court explained, "the circuit court correctly applied Rule 403's balancing analysis in ruling the probative value of the crime scene photographs outweighed their prejudicial effect because these photos showed 'the scene as it occurred' and 'where the body was found in the house.'" *Id.* at 131, 813 S.E.2d at 520. The photos illustrated the extreme nature of the killing, showing multiple wounds and abrasions on the victim's extremities, contusions all over her body, and a bite mark. *Id.* *But see State v. Nelson*, 440 S.C. 413, 426, 891 S.E.2d 508, 514 (2023) (reversing murder conviction where admission of "excessively gruesome autopsy photos unnecessarily created the potential for the jury to convict [the defendant] of the murder based on inflamed emotions in a case where the jury was provided with undisputed evidence as to how [v]ictim died, as well as ample evidence that she had been killed with malice").

The photographs of Victim's body taken at this crime scene are grisly. But unlike the crime scene photographs in *Hawes*, these photos were taken after Victim's burned body was placed on a stretcher and thus are not probative to demonstrate the crime scene as it occurred. Perhaps recognizing this, the State now argues the crime scene photographs of Victim's burned body served to aid the jury in understanding that her murder and the desecration of her remains involved separate criminal acts.

To satisfy the elements of the desecration charge, it was necessary that the State prove Gleaton murdered Victim and then "willfully and knowingly, and without proper legal authority . . . destroy[ed] or damage[ed] the remains of a deceased

human being." S.C. Code Ann. 16-17-600(A) (Supp. 2023). To this end, it was essential for the State to prove to the jury that Gleaton killed Victim and, knowing she was dead, set fire to her body and her home. But this is not something the black and white photographs from the scene could establish; thus the photos are lacking in probative value. By contrast, the photographs from Victim's autopsy—which Dr. Durso used during her testimony to explain the causes of Victim's death and establish her remains were set afire post-mortem—satisfied the State's purpose of differentiating the murder and desecration elements for the jury. Our supreme court has "long warned the State not to overplay its hand in criminal trials by seeking to admit shockingly graphic photographs that have scant probative value in violation of Rule 403, SCRE, just to inflame the passions of the jury." *State v. Benton*, 443 S.C. 1, 8-9, 901 S.E.2d 701, 704-05 (2024).[12]

It is true that these photographs of Victim's condition and injuries corroborated the testimony of various witnesses—paramedic crew chief John Bailey, RCSD Deputy Zachary Keefe, and Deputy Coroner Susan Acerra—who testified as to the nature and severity of Victim's injuries. However, because the autopsy photos, discussed below, served the same purpose, we find the circuit court abused its discretion in also admitting the black and white photographs of Victim taken at the crime scene after her body had been moved to a stretcher. *See, e.g., Nelson*, 440 S.C. at 426, 891 S.E.2d at 515 (noting "minimal probative value" of gruesome autopsy photos because "[o]ther convincing evidence established malice and how Victim was killed, thereby eliminating the photos' probative value"); *State v. Kornahrens*, 290 S.C. 281, 288-89, 350 S.E.2d 180, 185 (1986) (reiterating that photographs of murder victims "should be excluded where the facts they are intended to show have been fully established by competent testimony").

---

[12] The State further argues the photographs "of Victim's body were critical to establishing Appellant acted with malice aforethought when he murdered her." *But see State v. Heyward*, 441 S.C. 484, 508-09, 895 S.E.2d 658, 671 (2023) (Kittredge, A.C.J., concurring) (explaining the use of "malice" as a justification for the admission of gruesome photographs demonstrates a "fundamental misunderstanding of malice" because "[t]here are no degrees of malice—it either exists, or it does not. It follows, then, that a 'gruesome' murder does not necessarily contain a greater degree of malice than a less violent murder"). We note neither the parties nor the circuit court had the benefit of our supreme court's analyses in *Jones*, *Benton*, *Nelson*, or *Heyward* at the time of Gleaton's trial or in briefing his appeal.

Even so, we find the circuit court's error in admitting these black and white photographs of Victim's body was harmless in light of the overwhelming evidence properly introduced to establish Gleaton's crimes. As in *Benton*, any such error "did not affect the result of the trial" because "[t]he record is loaded with compelling evidence incriminating [Gleaton] of each of the crimes in this violent spree." *See Benton*, 443 S.C. at 9-10, 901 S.E.2d at 705.

## B. Color Autopsy Photographs

Seeking to admit several autopsy photographs (State's Exhibits #136, #137, #138, #139, #140, and #141), the State proffered the testimony of forensic pathologist Durso. Dr. Durso testified State's Exhibit #136 shows the side of Victim's head with a belt around her neck and no soot under the belt—indicating the belt was around Victim's neck before the fire started. State's Exhibit #137 shows the upper airway (epiglottis and trachea) with no soot, again indicating Victim was already dead when the fire started. State's Exhibit #138 shows Victim's right eye with a dark red hemorrhage and petechiae, indicating Victim was alive when she was strangled. State's Exhibit #139 shows a gunshot entrance wound in a charred area of Victim's back; Dr. Durso explained the charring was relevant to establish why she could not estimate the distance of the gunshot. State's Exhibit #140 shows a laceration and bruising from blunt force trauma to the side of Victim's head. Finally, Dr. Durso testified State's Exhibit #141 shows the laceration on the side of Victim's head with the skin reflected (pulled back) to demonstrate the hemorrhage—indicating Victim was alive when Gleaton forcefully struck her. Dr. Durso noted black and white photographs would not have assisted her in properly explaining the injuries to the jury.

Gleaton properly objected to admission of the autopsy photos, arguing:

> Just that they're more prejudicial than probative. Her cause of death isn't an issue or how she died. It's not something that we're contesting at all. It's not part of our case, to make it consistent with the other pictures where she died, we would submit that they cannot be admissible at all, but if so, black and white is sufficient to show what she's talking about. Specifically with some of the more graphic ones, the injury to her head that just shows a cut, I think you can see that in black and white so we'd ask that they be in black and white.

The circuit court overruled the objection stating, "All right. Your request is denied. The photos are in over your objection. Is there anything further?"

Dr. Durso was subsequently qualified, without objection, as an expert in forensic pathology. She testified Victim's cause of death was a combination of a blow to her head, strangulation, and two gunshot wounds, all of which occurred before the fire. Defense counsel renewed her objection to the autopsy photos when the State moved to introduce them. Additionally, defense counsel objected to the State's publication of the photographs by projecting them on a screen arguing "the size makes it extra prejudicial." The circuit court again overruled the objection stating, "Thank you, ma'am. The decision has already been made. Those photos are in evidence so over [your] objection [the State] may publish them." Dr. Durso then explained State's Exhibits 136 through 141 to the jury. Defense counsel again renewed her objections to the autopsy photographs at the close of the State's case.

In *Jones*, a capital case in which a father was convicted of murdering his five young children, our supreme court found the gruesome autopsy photographs admitted at trial were of no probative value. 440 S.C. at 262, 891 S.E.2d at 372. Over Jones's objection, the photos were admitted during the testimony of expert witness Dr. Janice Ross, the forensic pathologist who performed the autopsies and photographed the decomposing bodies. *Id.*

Our supreme court detailed its reasoning for finding the autopsy photos inadmissible under Rule 403:

> [T]he autopsy photographs in this case were of no probative value. The photographs here do not depict the children's bodies in substantially the same condition in which Jones left them. The photographs depict the children's bodies in the advanced stages of decomposition occurring in the three days between the time Jones dumped the bodies to the time law enforcement discovered them. The bodies were so severely decomposed that with the exception of one photograph, neither strangulation nor ligature marks were visible to corroborate Dr. Ross's testimony. The State does not claim Jones altered his children's faces or limbs, yet several photographs showed extensive tissue loss appearing as though an animal had eaten their faces and limbs.

> Even assuming the photographs had some probative
> value because they purport to show Jones's character
> through the method and manner in which he bagged and
> disposed of the bodies, we hold as a matter of law that
> under Rule 403, such probative value . . . was
> substantially outweighed by the danger of unfair
> prejudice to Jones.  The photographs show the children's
> bodies in a state of complete discoloration; they were
> engulfed in maggots and contorted beyond recognition.
> Some of the children's faces were missing, a number of
> their limbs had been eaten by animals, and one child's
> head had decomposed to skeletal remains.

*Id.* at 262-63, 891 S.E.2d at 372.  Nevertheless, the supreme court found the photographs dd not contribute to the jury's sentence of death, in part due to the horrific nature of the murders and "Jones's calculated efforts to dispose of his children's bodies in a remote area to evade responsibility for what he had done." *Id.* at 264, 891 S.E.2d at 373.

While graphic and disturbing, the autopsy photographs in this case had significant probative value in that they showed a lack of soot underneath the belt (indicating the belt was placed around Victim's neck before she was set on fire); a lack of soot inside Victim's airway (establishing she was dead before she was set on fire); a dark red hemorrhage and petechiae (indicating she was alive when she was strangled); and the laceration on Victim's head with her scalp reflected to show the hemorrhage (indicating she was alive when Gleaton struck her).  *See Heyward*, 441 S.C. at 503, 895 S.E.2d at 668 (finding no abuse of discretion in trial court's admission of autopsy photograph of victim's reflected scalp where the only evidence of victim's multiple blunt force injuries to the head was pathologist's testimony regarding her "observations after reflecting [the victim's] scalp and the autopsy photographs corroborating [her] testimony").  The photographs admitted here visually demonstrated the causes of Victim's death in a way testimony alone could not, and they aided Dr. Durso in explaining Victim's injuries to the jury.  The photographs further served to aid the jury in its analysis of Victim's murder and the desecration of her remains as two separate criminal acts.  According to Dr. Durso, the gunshot wounds, strangulation, and head trauma were inflicted on Victim while she was alive, and any one of those acts could have been fatal.  Therefore, despite our discomfort with the circuit court's demeanor in addressing defense counsel's

proper objections to the various photographs, we find the circuit court did not abuse its discretion in admitting the autopsy photographs.

## C. Photograph of Victim Smiling in a Restaurant

In contrast to the crime scene and autopsy photographs, the State presented Son with a photograph of Victim smiling in a restaurant booth. Defense counsel timely objected and, after a sidebar, the circuit court overruled the objection. The State properly conceded at oral argument that the admission of this photograph was error, but asserts this error was harmless. We agree this error was harmless as this photograph could not have influenced the jury's verdict. *See, e.g., State v. Owens*, 427 S.C. 325, 831 S.E.2d 126 (Ct. App. 2019) (explaining that to warrant reversal based on the erroneous admission of such a photograph, a defendant "must show the error prejudiced him, meaning the challenged evidence likely influenced the verdict" and any prejudice resulting from admission of the irrelevant photograph "had little effect when considered alongside the other evidence"), *aff'd*, 433 S.C. 482, 860 S.E.2d 357 (2021).

## III.    Hearsay

Gleaton next argues the circuit court erred in allowing a witness to testify that Victim told her Gleaton pulled a gun on her approximately a month before her murder. Although we are again troubled by the circuit court's reaction to trial counsel's proper efforts to challenge the admission of this testimony, we find no reversible error.

The State questioned Gantt about Gleaton's prior attack on Victim, which occurred about a month before her murder. When the State asked about a conversation Gantt had with Gleaton the day after this incident, Gantt stated, "Okay. Well, when [Victim] called me that night—So I'm gonna back [up]. When [Victim] called me that night and told me what happened." Defense counsel objected and the State replied, "Let's skip that." The circuit court then interjected, "She called and said what happened. What's your objection? What's your objection?" Defense counsel answered, "I believe the witness was going to go into hearsay." The court responded, "No, ma'am. What is your objection? Not what you believe she might say." Defense counsel answered, "Hearsay." The circuit court stated, "It's premature. You're premature. Go ahead." The State continued, "Now, Ms. Gantt, if you would, describe the conversation with Mr. Gleaton in the kitchen the day that you are describing."

[Gantt]: Oh, okay.  Well, it's about three in the afternoon when he came back and he sat down and he shook his head.  He said, I've had a long night.  I said, I bet you have.  And he asked me, did [Victim] tell you anything?  I said, yes.  She did.  And he asked me, well, what did she say?  And I said, well, she told me that you—

[Defense Counsel]: Objection, Your Honor.

[Court]: Basis.

[Defense Counsel]: Hearsay.  She said—

[Court]: I disagree. I disagree, ma'am.

[Defense Counsel]: She said she told me.

[Court]: Overruled.  Sit down.  Continue.  This is a conversation with the defendant; am I correct?

[State]: Yes, Your Honor.

[Court]: All right.

[Defense Counsel]: Your Honor, she stated she told me based on a conversation with [Victim].  That is hearsay.  She is not here.

[Court]: Thank you.  Continue.

[State]: It's a statement of which he has adopted the truth, Your Honor.

[Court]: All right.

When the State again asked Gantt about her conversation with Gleaton, Gantt testified, "I asked him if he, you know, did what she said he did and he just nodded his head yes and dropped his head down like this (indicating)."  The State clarified, "Back up.  When you told him what she said he did, did he agree to what was it [sic] that he did?"  Gantt responded, "He pulled a gun on her."

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and is inadmissible unless it falls under one of the enumerated exceptions to the hearsay rule. Rules 801(c) & 802, SCRE. Under Rule 801(d)(2)(B) of the South Carolina Rules of Evidence, an admission by a party-opponent is not hearsay if the "statement is offered against a party and is . . . (B) a statement of which the party has manifested an adoption or belief in its truth."

In *State v. Knoten*, our supreme court found statements made by the defendant's mother to the defendant in the presence of a police officer were not inadmissible hearsay. 347 S.C. 296, 312, 555 S.E.2d 391, 399-400 (2001). Over Knoten's objection, the circuit court permitted the police officer to recount a conversation between Knoten and his mother during which the mother indicated she did not believe Knoten was telling the truth when he denied knowledge of the victim's disappearance. *Id.* at 310-11, 555 S.E.2d at 399. Finding no error, Justice Pleicones explained:

> The State argues, inter alia, that under Rule 801(d)(2)(B) SCRE, the statement was not hearsay. That rule provides "A statement is not hearsay if . . . the statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth."
>
>  . . . .
>
> We agree that [Knoten] adopted the statement when he later confessed to the crimes. "A party who has agreed with or concurred in an oral statement of another has adopted it." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 801.31[3][b] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2000).
>
> Because [Knoten] did not refuse his mother's statement, and later admitted he was lying when he denied involvement in or knowledge of the offenses charged, his mother's statement was not hearsay.

*Id.* at 313, 555 S.E.2d at 400 (other internal citations omitted).

Similarly, in *United States v. Robinson*, 275 F.3d 371 (4th Cir. 2001), the Fourth Circuit affirmed the district court's admission of statements a witness overheard from two codefendants describing their crime because each codefendant adopted the statements of the other. Thus, the witness's testimony was not hearsay, but the recounting of an adopted admission pursuant to Rule 80l(d)(2)(B) of the Federal Rules of Evidence. *Id.* at 382-83. The language of Rule 80l(d)(2)(B), FRE, is substantively similar to that of South Carolina's rule. *See* Rule 80l(d)(2)(B), FRE ("A statement that meets the following conditions is not hearsay: . . . (2) An Opposing Party's Statement. The statement is offered against an opposing party and: . . . (B) is one the party manifested that it adopted or believed to be true.").

We find Gleaton adopted the statement when he nodded "yes" and questioned Gantt about what Victim told her. On appeal, Gleaton asserts that for Rule 801(d)(2)(B) to apply, the person who initially made the comments adopted by a defendant must have done so in the presence of a party opponent. However, we are not convinced such a requirement exists within the rule. *See* Rule 801(d)(2), SCRE ("Admission by Party-Opponent. The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity, or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."). In fact, the court in *Knoten* rejected a similar argument in finding Knoten adopted his mother's statement when he subsequently confessed to the crime outside her presence. 347 S.C. at 312-13, 555 S.E.2d at 400. Despite the circuit court's problematic and unduly harsh treatment of defense counsel during her proper efforts to object, we find the court did not abuse its discretion in admitting Gantt's testimony under Rule 801(d)(2)(B), SCRE.

Moreover, any error in admitting this exchange would be harmless in light of Gantt's other testimony recounting Gleaton's statement from the night the police chased him through Waffle House parking lot. That night, Gleaton warned Gantt, "You tell—tell her when you see her or talk to her again she's dead. I'll kill her." This statement was clearly admissible. And, we note Son had already testified about the prior domestic violence incident, DSS's removal of the children from Victim's home, and Victim's report to Son that Gleaton shoved a gun into her ribs (culminating with Son's viewing of the barrel imprint).

## IV.    Request for Friday Afternoon Recess

Challenging the circuit court's management of the trial, Gleaton argues it was error for the court to refuse defense counsel's request to recess for the day on Friday at 5:00 PM.  Instead, the circuit court continued with closing arguments, jury instructions, and deliberations.  We find no reversible error.

The defense called its final witness at 2:35 PM on Friday, November 1.  At 4:00 PM, after this witness concluded his testimony, the jury was excused and the circuit court made the following comments:

> It will probably be around 6:00 before this jury gets this case.  Everybody agrees with that.  So I didn't ask them out of politeness and courtesy.  No more witnesses and maybe 20, 30 minutes, something like that, some argument on charges, so you see what I'm getting to.  Do they want to stay the rest of the day until they finish.  Do they want to come back Monday.  I need to ask them these questions.  They need to talk about it and let me know.  Is that fair enough?

Both the State and defense counsel initially agreed, but defense counsel then added, "I think our position would be that we would prefer, we think that it's been a long day, a long week, we would prefer that closings and the jury is charged on Monday."  Defense counsel alternatively sought to resume the next day.  The State preferred to continue rather than resume on Saturday or Monday.  The court acknowledged "everybody is tired" but decided to allow the jury to choose how it wished to proceed.

Following a short break to consider the options, the jury sent a note indicating it wished to continue through Friday evening.  Citing the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, defense counsel objected, stating:

> [I]t has been a long week.  People have been needing multiple breaks for being tired.  We need people to be concentrating through the end and through deliberation and obviously at 4:25 we have not even started closings yet so I think the likelihood of it getting to the jury before six, before seven even might be wishful thinking and that

would cause the jurors to deliberate and have more fervor
than actually taking the time and really—

The circuit court then interrupted and denied the motion to recess and resume on Saturday or Monday. Closing arguments started at 5:00 PM. The court begin instructing the jury at 6:25 PM, and deliberations began at 7:00 PM. The jury reached its verdicts at 8:30 PM.

"[T]he conduct of a criminal trial is left largely to the sound discretion of the presiding judge and this Court will not interfere unless it clearly appears that the rights of the complaining party were abused or prejudiced in some way." *State v. Hughes*, 419 S.C. 149, 160, 796 S.E.2d 174, 180 (Ct. App. 2017) (quoting *State v. Bridges*, 278 S.C. 447, 448, 298 S.E.2d 212, 212 (1982)). "As with requests for a trial continuance, requests for a recess during trial are within the trial judge's discretion, and will be reversed on appeal only upon a showing of an abuse of that discretion." *State v. Mitchell*, 330 S.C. 189, 192, 498 S.E.2d 642, 644 (1998). "Furthermore, the appellant must show prejudice stemming from the trial court's denial of the motion to recess in order for the denial to be reversible error." *State v. Brannon*, 341 S.C. 271, 276, 533 S.E.2d 345, 347 (Ct. App. 2000).

The record demonstrates the circuit court allowed the jury to decide whether to proceed or recess to another day for closing arguments, the court's charge, and deliberations. We agree with the circuit court's recognition that asking a jury's preference and then continuing the trial at its request "is not uncommon" and circuit courts "do this all the time." Although Gleaton argues "[t]he forced deliberations resulted in a coerced verdict," he has made no showing that he was prejudiced by the circuit court's refusal to delay the proceedings. Thus, we find the circuit court did not err in continuing with the trial pursuant to the jury's request.

## V. Sentencing

The circuit court's handling of Gleaton's sentencing is more problematic. Gleaton argues the circuit court erred in refusing to defer sentencing to allow the proper presentation of mitigation evidence after a week-long trial in which the jury reached a verdict at 8:30 PM on Friday night. We disagree, but note the circuit court's handling of defense counsel's reasonable requests further emphasizes the problematic demeanor that pervaded this trial.

After the jury returned the guilty verdicts and was released from service at 8:45 PM, defense counsel renewed all prior motions, including Gleaton's motion for a mistrial, and requested a new trial. The circuit court responded:

> [Court]: Your request is denied. Anything further?
>
> [Defense Counsel]: We would like to submit a written brief within ten—
>
> [Court]: Denied. Bring the prisoner around.
> [Defense Counsel]: Your Honor, may I ask—
>
> [Court]: Sure. Go ahead.
>
> [State]: Would it be all right to defer sentencing?
>
> [Court]: No.
>
> [Defense Counsel]: No.
>
> [Court]: Let's do it now. I want to end this matter now.
>
> [Defense Counsel]: Your Honor, we do have some of his family members who—
>
> [Court]: Ma'am, I have been patient this whole week with everybody involved. I think I have been as fair as I possibly could to both sides. This matter is concluded. We tried it for a week. What additional time do you think is necessary?

The circuit court cut defense counsel off again as she tried to answer and told her to "[t]alk to the State. I don't care." After speaking with Victim's family, the State noted its preference was to go forward. Defense counsel then explained that some of Gleaton's family members, including his mother—who had been present throughout the week and did not have a phone—were not present. The court initially indicated it could defer sentencing for ten days, but also told defense counsel, "I can send the jury home. We can wait until she gets here. Is that what you want me to do?" However, when defense counsel asked that sentencing be deferred, the court replied, "No. No. No. I'm not gonna do that. I'm gonna do it

now.  Anything further?  Bring him around."  The circuit court then sentenced Gleaton to life in prison without hearing any mitigation evidence—and without hearing from the State.  Sentencing concluded at 8:50 PM.

Gleaton's post-trial motions for a new trial and sentencing hearing addressed the circuit court's demeanor in detailed affidavits.  The circuit court denied these motions without a hearing.

"At sentencing, a judge has an obligation to consider information material to punishment."  *Hayden v. State*, 283 S.C. 121, 123, 322 S.E.2d 14, 15 (1984).  "A sentencing judge 'may appropriately conduct an inquiry broad in scope, largely unlimited as to either the kind of information he may consider, or the source from which it may come.'"  *Id.* (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)).

In *State v. Dukes*, this court explained:

> Procedural due process requires "adequate notice of the proceeding, the opportunity to be heard in person, the opportunity to introduce evidence, the right to confront and cross-examine adverse witnesses, and the right to meaningful judicial review."  *Dangerfield v. State*, 376 S.C. 176, 179, 656 S.E.2d 352, 354 (2008).  It does not, however, require any particular form of procedure.  *See S.C. Dep't of Soc. Servs. v. Wilson*, 352 S.C. 445, 452, 574 S.E.2d 730, 733 (2002) (stating "due process is flexible and calls for such procedural protections as the particular situation demands" (citation and quotation marks omitted)).  Due process also does not require all witnesses to testify.  *See United States v. Morsley*, 454 Fed.Appx. 191, 193 (4th Cir.2011) (stating the constitution "does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses" (citation omitted)).  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Wilson*, 352 S.C. at 452, 574 S.E.2d at 734.

404 S.C. 553, 558, 745 S.E.2d 137, 140 (Ct. App. 2013).

Regarding sentencing, our supreme court has explained:

> Generally, a sentencing judge has great discretion in the kind of evidence she may use to assist her in determining the punishment to be imposed. Indeed, she is obligated to consider information material to punishment and may "exercise a wide discretion in the sources and types of evidence used to assist [her] in determining the kind and extent of punishment to be imposed within limits fixed by law."

*State v. Quinn*, 430 S.C. 115, 125-26, 843 S.E.2d 355, 360-61 (2020) (internal citations omitted).

Here, Gleaton's mother and other family members had attended trial all week but were absent from the Friday night conclusion. Other than referencing his mother's absence, Gleaton failed to demonstrate how he was prejudiced by the circuit court's decision to move forward with the sentencing hearing.[13] *See, e.g.*, *Dukes*, 404 S.C. at 558, 745 S.E.2d at 140 ("Due process also does not require all witnesses to testify."). In light of Gleaton's prior criminal record;[14] the brutality of his crimes;

---

[13] Gleaton was raised by his grandmother whom he believed to be his mother. He was raised to believe his biological mother was his sister and had only recently learned she was actually his mother. Both Gleaton's mother and grandmother submitted affidavits, and we are unclear about which maternal relative defense counsel was referencing when Gleaton initially asked to defer sentencing so his mother could return. Nevertheless, we note defense counsel presented the same information to the circuit court through the affidavits submitted with Gleaton's post-trial motions that would have been presented through witnesses at his initial sentencing. We find no error in the circuit court's declining to modify Gleaton's sentences after reviewing this submitted information. *See, e.g.*, *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 ("Error is harmless when it 'could not reasonably have affected the result of the trial.'" (quoting *State v. Key,* 256 S.C. 90, 93, 180 S.E.2d 888, 890 (1971)).

[14] The circuit court did not permit either the State or the defense to present the information usually provided at sentencing. However, Gleaton's prior criminal record was included in the motion to bifurcate. His prior record includes convictions for second degree arson, criminal domestic violence (first offense), criminal domestic violence of a high and aggravated nature, and possession with

and his effort to conceal his crimes by setting Victim, her bed, and her home on fire, we find the mitigation evidence provided in the post-trial affidavits would not have altered his resulting life sentence had the circuit court deferred sentencing.

Although we find it was not reversible error for the circuit court to refuse to defer sentencing to allow Gleaton's family members time to return to the courtroom, we agree with Gleaton that the circuit court was required to consider information material to punishment which, at least initially, it failed to do. However, the circuit court had the opportunity to consider the detailed affidavits of Gleaton's mother and grandmother submitted in mitigation post-trial, and still declined to modify Gleaton's sentence of life imprisonment

We acknowledge the circuit court's demeanor at times during this trial—as reflected in the trial transcript and post-trial affidavits—was troubling. Under different circumstances, this alone might require a remand for a proper sentencing proceeding or even a reversal for a new trial. But here, following our review of the trial record and affidavits submitted in mitigation, we cannot see how a new sentencing hearing could possibly change Gleaton's resulting sentence of life imprisonment. *See, e.g.*, *Smalls v. State*, 422 S.C. 174, 195, 810 S.E.2d 836, 847 (2018) (reversing denial of post-conviction relief and noting while the PCR court ordinarily should make the factual findings on questions of prejudice, remand was unnecessary because the supreme court had conducted the prejudice analysis).[15]

## VI. Motion for a New Trial – Cumulative Error

Finally, Gleaton argues he is entitled to a new trial based on the cumulative effect of the trial errors. We disagree.

Prior to sentencing, defense counsel moved for a new trial and renewed all prior objections and motions. Although defense counsel did not explicitly seek a new trial using the words "cumulative error," she clearly presented the issue. *See, e.g.*, *State v. Russell*, 345 S.C. 128, 132, 546 S.E.2d 202, 204 (Ct. App. 2001) ("Although Russell did not use the exact words "*corpus delicti* " in his request for a directed verdict, it is clear from the argument presented in the record that the

intent to distribute crack cocaine. Gleaton was on federal parole at the time of Victim's murder.

[15] Other issues set forth in the post-trial affidavits of defense counsel were not raised separately for appellate consideration.

motion was made on this ground. The State, in opposing the motion, used the words "*corpus delicti*" and cited the relevant case law. Therefore, we find the argument was raised to the trial court and is preserved."). Gleaton later filed a lengthy motion for a new trial and meaningful sentencing hearing, along with several supporting affidavits. One of the arguments included in this written motion specifies that he seeks a new trial based on the cumulative effect of the trial court's errors. The circuit court denied all post-trial motions. Thus, the cumulative error question was properly raised to and ruled on by the circuit court.[16] *See Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review.").

"The cumulative error doctrine provides relief to a party when a combination of errors, insignificant by themselves, has the effect of preventing the party from receiving a fair trial, and the cumulative effect of the errors affects the outcome of the trial." *State v. Beekman*, 405 S.C. 225, 237, 746 S.E.2d 483, 490 (Ct. App. 2013), *aff'd*, 415 S.C. 632, 785 S.E.2d 202 (2016). "An appellant must demonstrate more than error in order to qualify for reversal pursuant to the cumulative error doctrine; rather, he must show the errors adversely affected his right to a fair trial to qualify for reversal on this ground." *Id.*

Gleaton argues the circuit court's errors in this case include the admission of unduly prejudicial photographs; the admission of inadmissible hearsay; the coercion of a verdict by refusing to recess late on a Friday afternoon following a week-long trial; the refusal to conduct a meaningful sentencing hearing; the refusal to bifurcate the proceeding; and the trial court's problematic demeanor, volume, and tone when dealing with defense counsel and at least one witness. We have already addressed the issues of bifurcation, the admission of evidence, and the denial of Gleaton's motion to recess on Friday afternoon and found they do not warrant a new trial.

Regarding the other instances Gleaton references as cumulative error, we note that pretrial and in Gleaton's post-trial motions, defense counsel argued Gantt's testimony about the prior violent incident was improperly admitted under *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923) and Rules 403 and 404(b), SCRE.

---

[16] We likewise reject the State's position that Gleaton's cumulative error argument has been abandoned.

Additionally, at the end of the day after Gantt testified, defense counsel moved for a mistrial based in part on "Your Honor's demeanor and volume and tone when ruling on defense objections," arguing the court's behavior impugned Gleaton's attorneys' credibility with the jury. Again, the circuit court interrupted and argued with defense counsel before allowing her to make her record. Although Gleaton asserted neither the circuit court's demeanor nor its denial of the mistrial motion as separate issues on appeal, we reference them here as Gleaton raised them within his cumulative error argument.

Considering all of the points raised—and despite the proper zealous efforts of his counsel both at trial and in briefing and arguing his appeal to this court—we find Gleaton has not met the burden of demonstrating that the combination of trial errors "ha[d] the effect of preventing [him] from receiving a fair trial." *Beekman*, 405 S.C. at 237, 746 S.E.2d at 490. The evidence here was overwhelming. In addition to the brutality of Victim's murder, the State presented evidence of Gleaton's ongoing domestic violence against Victim and his complete lack of remorse. Gleaton assaulted Victim on multiple occasions, and the violence ultimately escalated to blunt force trauma to Victim's head, strangulation, and multiple gunshot wounds, followed by Gleaton's attempted destruction of evidence by setting fire to Victim's body and home. Gleaton then stole electronics from Victim's home, planned an escape to Houston, and tried to pin the murder on Dukes after Dukes witnessed Gleaton with his foot on Victim's head, strangling her with a belt in the bloody bedroom.

We affirm the convictions and sentence of life imprisonment.

**AFFIRMED.**

**THOMAS and HEWITT, JJ., concur.**